Basil H. Coutrakon and Katherine J. Coutrakon, Plaintiffs-Appellees, v. J. Fred Adams, Individually, and J. Fred Adams, Contractor and Builder, a Partnership Composed of J. Fred Adams, Thomas Donnelly, Jr., Ralph Cox and Robert Wagner, Defendants-Appellants.

Gen. No. 10,406.

Third District.

February 26, 1963.

Rehearing denied March 26, 1963.

Londrigan & Londrigan, of Springfield (Brown, Hay & Stephens, and Elizabeth G. Frazee, of counsel), for appellants.

Coutrakon and Coutrakon, of Springfield, for appellees.

ROETH, JUSTICE.

Plaintiffs recovered a judgment against defendants J. Fred Adams, Thomas Donnelly, Jr., Ralph Cox and Robert Wagner for $23,902.08. This judgment is a consolidation of two jury verdicts rendered at the same time in this cause which represented damages sustained by plaintiffs as a result of two fires which occurred in the residence of plaintiffs on January 6, 1954, and January 10, 1954. Defendants appeal from this judgment. The case was submitted to the jury upon two counts of an amended complaint. The one count charges in substance that in contracting for the sale of the house during construction and in consummating the contract after completion the defendants *impliedly*

*warranted* that said house would be of good, proper and safe construction, built in a workmanlike manner, in conformity to good, safe standard building practices, and upon completion would be free from fire hazards and safe and fit to live in. The count then charges a breach of these implied warranties, by reason of an alleged faulty installation of a Hydrotherm gas fired boiler unit, as a result of which, allegedly, the two fires occurred. The other count charges in substance that by reason of the alleged faulty installation of the unit the defendants created a nuisance on the premises. Primarily this case presents a question of law as to whether or not under the factual situation here present, there is an implied warranty of fitness in the sale of the house in question.

The defendant J. Fred Adams had been a building contractor for about 20 years prior to 1953. In that year he and the defendants Donnelly, Cox and Wagner were partners engaged in the erection of homes for sale to the public. In the building of a house the four men pooled their efforts. Adams did the arranging, kept the books and did various work on the job. Donnelly made the decisions on the details of the carpentry work and did some of this work. Wagner also was a carpenter. Cox was the painter and decorator. The electrical work and plumbing and heating work were contracted to licensed plumbers and electricians.

These four defendants commenced the construction of the house in question in the fall of 1952. During the course of the construction and in the spring of 1953 the plaintiffs looked at the uncompleted house. They went through the house looking it over and were in the premises during the course of construction on three or four different occasions. On June 9, 1953, they entered into a contract to purchase this house. It is significant to note that the contract to sell specifically provided that the defendant J. Fred Adams agreed

292

to complete the (1) screening of the porch (2) laying and finishing the flooring in the bedrooms and kitchen (3) installing the electricity and fixtures and (4) the interior and exterior painting, in a good workmanlike manner. It is a reasonable presumption that except for these items the construction had for the most part been completed. So far as the utility room and heating unit therein are concerned, the room had been completed and the unit installed and plaintiff Basil testified directly to making an inspection of these items. The house was completed in the latter part of June and plaintiffs paid the purchase price, received the usual deed of conveyance and moved into the house on the 3rd day of July, 1953.

The house was a one-story brick with three bedrooms, living room, kitchen, bath and a so-called utility room. It had no basement but was built up off the ground with a crawl space under it of about 2½ feet. The floor joists were 2″ x 10″ set 16″ apart. Aluminum foil was laid over the joists and then 1″ x 8″ subflooring which was then covered with ½″ plywood. The utility room was 6 feet long east and west, 30 inches wide north and south and 8 feet high and the walls of this room were covered with plywood. This utility room was adjacent to the kitchen. A door of this room opened into the kitchen. As one opened the door of this utility room you faced south. A gas fired boiler was located to the east in the room, a water heater to the west and an electrical circulating pump in the middle. The 6 foot wall on the south was a partial partition wall of the living room and a fireplace in the living room cornered up with a corner of this wall. In the construction of this house the defendants contracted the electrical work to a man by the name of Mohan and the plumbing and heating work to a man by the name of Bozis. At this time Adams was interested in hot water radiant heating

for this house. He had installed such a system in another house he had built and Bozis showed him a Hydrotherm system which was in operation. As a result, a Hydrotherm unit was purchased and delivered to the job. This Hydrotherm unit is a gas burner-boiler unit. Heat from the burner heats the water in the boiler section which in turn is circulated by a circulating pump through pipes which are in the ceilings. The Hydrotherm unit, the circulating pump and an electric water heater were all installed in the utility room. Installation of this unit by Bozis was done while the defendants were completing the construction of this house.

From photographs admitted in evidence and undisputed testimony it appears that the Hydrotherm unit consists of a gas burner mechanism at the bottom, into which gas is fed under specific pressure through multi port holes, where it is ignited. This burner mechanism is about 6 to 8 inches above the bottom of the unit and is surrounded by a four sided casting which is open at the top and bottom. The cast iron sections of the boiler through which water circulates are placed over the gas burning unit. Water is thus heated and circulated through the system. There are certain controls on the front of the unit and the entire unit including the controls is encased in a metal jacket extending around the four sides and the top. From the center of the top of the jacket a round exhaust pipe extends upward which is connected to a flue to carry off the burnt gases. This pipe becomes hot while the burner is in operation as the exhaust gases are expelled. A door at the front of the jacket gives access to the controls. This metal jacket measures 18 inches wide, 27 inches long and 30 inches high. Installation instructions covering this equipment *recommend* that the unit be mounted on a 3 inch concrete base. This was not done in installing the Hydrotherm

294

unit in the house in question. After plaintiffs moved into the house Basil Coutrakon installed two shelves in the utility room, the lower one 5 feet off the floor and the other about a foot higher. These shelves were bracketed on the 6 foot inside wall of the utility room. Plaintiffs kept soap, toilet tissue, Kleenex, detergents and household materials generally on these shelves. The utility room was also used to store a vacuum cleaner, a wet type mop, an ironing board, iron, and box of vacuum cleaner attachments.

Raymond Carroll, who was a professional engineer and professor of mechanical engineering at the University of Illinois and had done considerable research in the heating field and was familiar with the Hydrotherm unit, testified that engineering codes and fire codes that are written for this purpose require that this type boiler be installed on a noncombustible floor and that the walls that surround the boiler be at least six (6) inches away from the sides of the boilers. In other words, these boilers are manufactured, tested and rated by a nationally recognized authority and given the so-called clearances as recognized by this authority which is typically six (6) inches at the side and must be mounted on noncombustible floor. The reason for requiring an installation of that type boiler on a noncombustible floor is that there is no structure between the combustion chamber and the combustible material it would be setting on. Therefore, of course, the combustible material becomes hot since it is contained within a combustible chamber and it is possible to raise it to its combustible point therefore and to cause a fire on the floor below.

The only positive evidence in the record as to whether or not any fireproof material was placed under the heater and on top of the plywood floor is that of Adams and Donnelly. The defendant Adams testified that he purchased a piece of ¼″ transite to

be placed on top of the plywood flooring underneath the unit. Transite is a fireproof material made of asbestos and cement. The defendant Donnelly testified that he installed the piece of transite in the utility room where the Hydrotherm unit was to be placed; that Adams was present during the installation and saw it. He further testified that the balance of the utility room was covered with a vinyl tile over the plywood and that no vinyl tile was placed on the transite. From other evidence in the record it appears that this same vinyl tile was used to cover the floor of the kitchen. The testimony of plaintiff Basil Coutrakon as to the presence or absence of the sheet of transite is of little assistance since he said he didn't know whether there was transite under the Hydrotherm unit. It is especially significant, however, to note that after the first fire, Bozis and Mohan at plaintiffs' request made repairs to the wiring and Hydrotherm unit. Also a heating contractor inspected the utility room and the Hydrotherm unit after the first fire and after Bozis had completed the repairs. He found the unit working satisfactorily and subsequently moved it to the garage. Also a carpenter superintendent for a contractor who worked on the repair of the house after the second fire testified. None of these witnesses testified to the absence of transite under the Hydrotherm unit.

The heat was turned on in the house in September, 1953. At about 2:00 a. m. on January 6, 1954, Basil was awakened and smelled smoke. His wife had entered the hospital two days earlier to deliver a baby. He got up, went to the utility room, opened the door and saw flames shooting up behind the Hydrotherm unit. He grabbed the vacuum cleaner, closed the door and called the fire department. They responded and subsequently extinguished the fire. The fire damage appeared to be largely confined to the utility room.

296

Several witnesses who saw the utility room after this fire testified to burnt paper, Kleenex and household articles on the floor and shelves and to a general scorching and charring of the walls. Other damage in the house was largely smoke damage. The next day Bozis and Mohan were at the house after being called to make repairs by plaintiff Basil Coutrakon. Adams was also there. Mohan repaired the wiring and Bozis did some work on the unit. Adams promised to clean out the charred material in the spring. When the work was completed on Thursday morning the unit was turned on and seemed to be functioning properly.

The house was vacant from Friday night until the second fire on Sunday morning, January 10, 1954. When Basil received word that his house was on fire he went to the scene. The roof and garage were all in flames. The fire was finally extinguished. Examination then made by Basil Coutrakon revealed that the kitchen and utility room seemed to have the most damage. The kitchen ceiling was completely burned out, the utility room was almost completely consumed by the fire from the floor up and with the open sky visible from above. The roof in the living room had caved in. More particularly the wall which was a partition between the living room and utility room was burned away and there was a continuous hole burned in the floor extending from the partition wall into the living room and into the utility room.

A hypothetical question was put to the witness Carroll. He was asked to assume certain facts shown by the record and then asked if he had an opinion based upon reasonable engineering and scientific certainty as to how the floor in the utility room under the boiler could have caught fire. This question was objected to as calling for an opinion on the ultimate fact to be determined by the jury. The objection was

overruled and he testified he had an opinion and that his opinion was as follows:

"In my opinion it could have caught fire only one way but due, perhaps, to two causes. The way it could catch fire is to be raised to what we call its, the floor's, ignition point.

"The combustible material of the floor in the presence of oxygen which is in the air, would form a volatile gas which would then burn and consume the floor. You can make something burn merely by heating it up without necessarily a flame being available. The other more direct process is to take a very hot flame, like lighting a match and applying it to a limited area, and starting a combustible fire. The combustion chamber of this boiler is made up of a cast iron enclosure on all sides with, of course, the cast iron sections containing the water and steam above and in this case an open bottom. This whole chamber is like the inside of any furnace. In fact we call this a furnace. That part of the boiler is a furnace. The inside of a furnace becomes very hot because of the energy released. It will warm up the casting. The casting in turn will conduct that heat around and down to the floor and, of course,—the flame, of course, itself depending upon its material has anything from a thousand (1000) to two thousand (2000) degrees in its own right. The radiation from that flame to combustible material reasonably close by would be enough to raise it to its combustible temperature under certain conditions. Now, of course, the other possibility is the one that where you have basically a hot element like this, still not to its combustible temperature; however, then due to some relative short application of a direct

flame immediately raise it to its combustible temperature and sustain a flame. The flame in a burning device like this is an instantaneous release of energy due to the mixing of gases. The explosion tends to fill the volume of the space it is contained in. The fact a flame goes up instead of down every time you light a burner is due to the engineering design of the burner and the flue passage. The flame has to go up, it being naturally the easier path; the energy of the flame has to get out instead of down. However, it is a common occurrence for the ignition of any gas to completely fill that chamber for a short period of time and during that period the flame could be down on the floor and raise the temperature to start it burning of its own accord.

"The flues in a gas boiler can become just as black and swollen with soot as an oil fired burner. With gas it is necessary to get enough oxygen to the burner. If you get incomplete combustion because of lack of oxygen the flame would get dirty and would soot up the combustion chamber, if the flues were sooted up the flames would have a harder time trying to get up through the combustion chamber and would have more tendency to come back out the bottom. Such flames could go down as far as 6 or 8 inches from the burner. Assuming there were no combustible openings in the door it would be my guess we would not have sufficient combustible air for proper combustion. The amount of soot accumulating in the flue would depend upon the amount of oxygen. The less oxygen coming into the room, the more sooting."

On cross examination this witness testified that his opinion was based primarily on the assumption that

299

the Hydrotherm unit was mounted entirely on a wooden floor and that if this were not true his opinion would be altered or modified; that if paper and similar combustible materials were in the utility room they would be ignited if they came in contact with the exhaust flue.

The cause of the two fires in question is shrouded in doubt. This is particularly true of the first fire. In this respect the case at bar is not unlike Schwartz v. Peoples Gas Light and Coke Co., 35 Ill App2d 25, 181 NE2d 826, in many of its aspects. However, we prefer to examine the broader legal question of implied warranty involved in this case.

 The almost universal rule the country over is that in the sale of a new dwelling or one in the process of construction there is no implied warranty on the part of the vendor of fitness, condition or quality. 55 Am Jur Vendor and Purchaser Sec 368; Annotation 78 ALR2d 446. A leading case in Illinois, cited in Am Jur, supra, is Mercer v. Meinel, 290 Ill 395, 125 NE 288. The basic reason for this rule is that a deed made in full execution of a contract of sale of land merges the provisions of the contract therein. If not so intended the parties to the deed may provide to the contrary by written warranties in the deed itself.

Counsel for plaintiffs, very frankly both in their brief and on oral argument, state that they seek to have this court alter this well established rule. They rely primarily on a treatise appearing in the 1953 Summer edition of Western Reserve Law Review page 357, two Ohio Court of Appeals cases, Vanderschrier v. Aaron, 103 Ohio App 340, 140 NE2d 819, and Galvin v. Keen, 100 Ohio App 100, 135 NE2d 769, and the case of Weck v. A:M Sunrise Const. Co., 36 Ill App2d 383, 184 NE2d 728, decided by the First District since this cause was submitted. The theory expounded in the Western Reserve Law Review, supra, and in a similar

treatise in 37 Minn Law Review 108 have been called to the attention of courts of other states where this problem has arisen and the theory advanced has been largely rejected. In some instances distinctions have been noted in the case of a house built and sold from a "model" already built or a house built and sold according to prepared plans and specifications in which instances the courts have implied a warranty that the house would conform to the "model" or to the prepared plans and specifications. We have carefully examined the two Ohio cases and while counsel for plaintiffs seem to gain much comfort from these cases, in the more recent case of Rappich v. Altermatt, 106 Ohio App 282, 151 NE2d 253, the Court of Appeals undertook to analyze its prior holdings and to spell out the limitations thereof in the following language:

"Counsel for the appellants cites several cases which he claims sustain his position. The first four of these are: Chapman v. Orrachio, 8 OLA 250; Fiebig v. Brofford, Ohio App, 97 NE2d 52; Galvin v. Keen, 100 Ohio App 100, 135 NE2d 769; and Gleason v. Bell, 91 Ohio St 268, 110 NE 513. We shall treat these together since all are distinguishable on the same grounds. Each of these cases was based on fraud which occurred by reason of the affirmative false representations made by the vendor regarding the quality or condition of the premises involved."

· · · · · ·

"The case of Vanderschrier v. Aaron, 103 Ohio App 340, 140 NE2d 819, differs from our case as it involved work to be done upon the property after the sale had been completed. This work was to be done in a good and workmanlike manner. The action was brought for breach of this agreement by the purchasers who claimed that certain of the additional work which had been

301

agreed to had either not been completed or if completed had not been performed in an efficient and workmanlike manner as agreed upon."

The cases of Smith v. Tucker, 151 Tenn 347, 270 SW 66, Levy v. C. Young Const. Co., 46 NJ Super 293, 134 A2d 717, Sarnicandro v. Lake Developers, Inc., 55 NJ Super 475, 151 A2d 48, Gilbert Const. Co. v. Gross, 212 Md 402, 129 A2d 518, and Steiber v. Palumbo, 219 Ore 479, 347 P2d 978, are leading cases in foreign jurisdictions and contain comprehensive discussions of the problem here involved with its many ramifications and sustain the generally accepted rule. In the Weck case, supra, there is a dissenting opinion by Justice Burke which in our opinion states the distinctions attendant upon a consideration of the question here involved and correctly applies the law as we regard it to be. It is to be noted from the majority opinion that Weck had been shown specifications of the house as it was to be constructed, presumably prior to the contract of sale. This, as we have heretofore noted, would bring the case within that class of cases which hold that under certain circumstances there is an implied warranty that the completed house will conform to the prepared plans and specifications. If in the final analysis this is not the basis for the majority opinion, we are not constrained to follow it.

■ ■ There remains a consideration of the nuisance theory alleged by plaintiffs in Count IV of the complaint which was submitted to the jury. This theory is closely allied to the negligence theory set forth in Count III of the complaint, as to which a verdict was directed by the trial court and as to which ruling there is a cross appeal. Count IV charges that the installation of the Hydrotherm unit constituted an *absolute* nuisance. We think this is tantamount to charging a nuisance per se. This charge

is in turn predicated on the claim that the Hydrotherm unit was installed on a wooden floor, contrary to some statute and rules promulgated thereunder. Legally, however, the fact that a defect on premises is a violation of some statute or ordinance has been held not to constitute negligence per se. Mercer v. Meinel, supra. In passing it should be noted that in the Sarnicandro case, supra, the nuisance theory was rejected. More important, however, is the fact that the factual situation in the case at bar, by reasonable inference or otherwise, does not support the initial premise of counsel for plaintiffs that the Hydrotherm unit was, in fact, installed on the wooden floor. If this be not true, then the horns of the dilemma preclude plaintiffs by reason of the fact that there was ample opportunity to discover the so-called absolute nuisance between the first and second fires. With reference to Count III, the trial court noted in directing a verdict that at the time of the repairs following the first fire, the repairs were not made by defendants, or under their direction or supervision, and they did not pay for the same. Even the Western Reserve Law Review treatise recognizes the rule of non-liability under such a factual situation. The negligence theory was discussed at some length in Combow v. Kansas City Ground Inv. Co., 358 Mo 934, 218 SW2d 539, Anno 8 ALR2d 218, and both the negligence and nuisance theories were discussed in McQuillan v. Clark Thread Co., 12 NJ Misc 409, 172 Atl 370, and rejected in this type of a case.

The language of the court in the Levy case, supra, is especially apropos:

> ". . . the policy reasons underlying the rule that the acceptance of a deed without covenants as to construction is the cut-off point so far as the vendor's liability is concerned, are rather obvious.

303

"Were plaintiffs successful under the facts presented to us, an element of uncertainty would pervade the entire real estate field. Real estate transactions would become chaotic if vendors were subjected to liability after they had parted with ownership and control of the premises. They could never be certain as to the limits or termination of their liability. The rule which we impose in the circumstances of the present action works no harshness on purchasers of real estate. Plaintiffs had an opportunity to protect themselves by extracting warranties or guaranties from the defendant in the contract of sale and by reserving them in the deed."

Especially is this true when it is remembered that after the first fire plaintiffs hired their own contractors to make repairs on the damaged system and relied on their judgment that the Hydrotherm unit was working satisfactorily.

For the reasons indicated, we are of the opinion that the trial court should have directed a verdict in favor of the defendants on all counts of the 3rd amended complaint or allowed the post trial motion for judgment notwithstanding the verdict and, therefore, the judgment is reversed.

Reversed.

REYNOLDS, P. J. and CARROLL, J., concur.