415 P.2d 698

Nedavia BETHLAHMY and Evelyn F. Beth-lahmy, husband and wife, Plain-tiffs-Appellants,

v.

Everett BECHTEL and A. L. Modin dba Mo-din Realty & Insurance Co., Defend-ants-Respondents.

No. 9681.

Supreme Court of Idaho.

June 14, 1966.

Coughlan & Imhoff, Boise, for appellants.

C. Ben Martin, Boise, for respondent Bechtel.

Davison, Davison & Copple, Boise, for respondent Modin.

TAYLOR, Justice.

April 12, 1963, plaintiffs (appellants), who were desirous of purchasing a home, met with one Roper, a salesman for A. L. Modin, dba Modin Realty & Insurance Company. Roper showed them a split-level home in Boise which was in course of construction by defendant (respondent) Bechtel. On the same day plaintiffs visited the house a second time in the company of Roper and Bechtel. Bechtel told plaintiffs the houses he built were the finest, that this house was of first quality construction, and assured them it would be completed and ready for occupancy on May 15th, following. Roper informed plaintiffs the house was outside the city limits of Boise and for that reason taxes would be low, but he also advised them it was entirely possible that Boise would extend the city limits to include this property in the near future. Neither Bechtel nor Roper at any time advised plaintiffs that there existed a covenant running with the land which limited occupancy to members of the Caucasian race.

Following the second visit to the property, plaintiffs entered into a contract for its purchase from defendant Bechtel, and moved into the house the following May 17th, although it had not been completely finished at that time. Construction was thereafter substantially completed and defects discovered by plaintiffs were generally remedied. About the middle of July plaintiffs discovered the covenant limiting occupancy to persons of the Caucasian race, and although the plaintiff husband testified he would not have purchased the house had he known of the restriction, plaintiffs were apparently satisfied when assured that the restriction was void and unenforceable. About the same time plaintiffs also discovered the property was located within the Boise city limits prior to its purchase by them. The representation by Roper that the house was outside the city limits was not actionably fraudulent for the reason that it was accompanied by the advice that it would likely be annexed to the city; also, the finding by the trial court that the representation was not material because plaintiffs would have purchased the property had they been advised that it was located within the city limits, was supported by the evidence. The judgment of dismissal in favor of Modin was proper.

Prior to construction of the house an open irrigation ditch crossed the lot from east to west. This ditch defendant Bechtel buried beneath the surface of the lot by means of a conduit laid in a trench dug along the course of the ditch and covered over with earth. This buried water conduit consisted of ten-inch drainage tile, in three foot sections butted together without any water seal in the joints. The house was then constructed in such location that this water conduit ran through under the concrete floor of the attached garage. The

garage was attached to the north end or side of the house. The tiled water line was seven to nine feet north of the north wall of the house, and approximately two to three feet in elevation above the level of the floor of the adjacent basement rooms. Plaintiffs were not informed of the existence of this underground water conduit.

Defendant Bechtel testified the outside of the basement walls were mopped with tar, and Hydroseal was used on the snap tie holes; that the eight-inch basement walls and the four-inch (actually 3½") basement floor slab were constructed of standard concrete five-sack-mix (which did not purport to be waterproof); that the concrete floor slab was laid on top of the foundation footings without any water seal in the joint between the footings, the walls, and the floor slab; and that, except for the use of tar and Hydroseal, as stated, no effort was made to make the basement waterproof.

In July, 1963, after the irrigation season had commenced, water seeped in around the edges of the basement rooms and spread over a considerable portion of the tiled floors. It was defendant's opinion that this water came from the tiled ditch underneath the garage. Holes drilled or broken through the garage floor next to the north wall of the dwelling house revealed that the soil thereunder had settled away from the floor three to four inches according to defendant, and up to twelve inches according to plaintiff, and was "wet" or "saturated." A crack developed in the garage floor near and parallel to the wall of the house.

When notified of the seepage, defendant rerouted the buried ditch from where it entered the lot at the east line, along the inside of the east line to the northeast corner, then west along the north line, and south along the west line to the point where the original ditch entered the culvert under Lenora street. Defendant testified he sealed the joints in the drainage tile used in this rerouting, but whether the tile itself was waterproof does not appear.

Water continued to seep into the basement rooms. Defendant then dug trenches in the back yard across and at a right-angle to the course of the original ditch. The second trench was extended downward through the hardpan and backfilled with gravel. He also dug holes on the outside of the foundation at points where water appeared to be coming into the house. These trenches and holes did not reveal the source of the water or prevent its continued flow. Water did not appear in these trenches or holes, although the soil in the sides and bottoms was moist. The failure to find water in these excavations, explains the testimony of some of the witnesses that they were "dry."

September 25, and November 24, 1963, plaintiffs gave notice of rescission of their contract, and tendered possession of the property to Bechtel. Upon Bechtel's refusal of rescission, plaintiffs brought this action against Bechtel and Modin. The record does not support the judgment in favor of Bechtel.

Keith E. Anderson, a hydrologist, basing his opinion upon an examination of the premises and a hypothetical statement of the facts, testified that in his opinion the water originally came from the covered tile under the garage floor; that water thereafter probably came from a "perched" water table established by irrigation water accumulating above a hardpan; that the water appearing in the basement rooms probably came through the joint between the foundation wall and the basement floor slab; and that the concrete in the basement walls and floor, and the joint between, could have been made waterproof by proper mixture and care in construction.

None of defendant's efforts to stop the seepage of water into the basement was successful, and the seepage continued from the middle of July to the forepart of November. During all this time plaintiffs tried to keep the water off the basement

floor by means of towels and other fabrics laid along the edges of the rooms, and by mopping up the water with towels, wringing it into buckets and carrying it out of the house. Defendant frequently visited at the house during that time and at times assisted in mopping up the water. Some bugs or insects appeared on the basement floors with the water. Plaintiffs placed bricks under the legs of the furniture in an effort to prevent damage thereto. As time went on an offensive odor pervaded the basement rooms. Plaintiffs' son and daughter were forced to move upstairs from the bedrooms which they had occupied in the basement. Some of the tiling on the floors and the mopboards were loosened by the water. Finally, about November 1st, plaintiffs moved out of the house because of the water which was still seeping into the basement rooms when they left the premises.

In rebuttal, defendant testified that in December, 1963, and at the time of trial in June, 1964, he peered through the windows of the vacated house and saw no water on the basement floors. In rebuttal plaintiff testified that on vacating the house the basement floors and baseboards had been thoroughly cleaned; and that at the time of trial he inspected the basement and found water stains, bugs and "black gook coming in from the floor tiles." This indicated water had seeped in after the house was vacated. The opinion of the hydrologist, and the testimony of the other witnesses that the seepage began with, and continued throughout, the 1963 irrigation season indicated that the seepage would occur during each successive irrigation season. Defendant does not assert that he did anything after the seepage began, to waterproof the basement.

Plaintiffs commenced this action for rescission and restitution, mainly on the ground of defendants' failure to disclose the defective condition of the house. The presence of the unsealed irrigation ditch through the lot and beneath the garage, coupled with the fact that the basement was not of waterproof construction, constituted major defects, known to defendants, and unknown to plaintiffs, and not discoverable upon reasonable inspection. Failure to disclose such defects would support a finding of fraud. Obde v. Schlemeyer, 56 Wash. 2d 449, 353 P.2d 672 (1960).

In the tentative draft of the Restatement of the Law Second, Torts, considered by The American Law Institute at its annual meeting in May, 1966, § 551(1) is presented as follows:

"(1) One who fails to disclose to another a thing which he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter which he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question."

and (so far as applicable here) subsection (2):

"(2) One party to a business transaction is under a duty to disclose to the other before the transaction is consummated

"(a) Such matters known to him as the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them; and

"(b) Such additional matters known to him as he knows to be necessary to prevent his partial statement of the facts from being misleading; and * * *

"(e) Facts basic to the transaction, if he knows that the other is about to enter into the transaction under a mistake as to such facts, and that the other, because of the relationship between them, the customs in the trade, or other objective circumstances, would reasonably expect a disclosure of such facts."

Illustration No. 9, under subsection (2)(e), is as follows:

"9. A sells B a dwelling house, without disclosing the fact that drain tile

under the house is so constructed that at periodic intervals it accumulates water under the house. A knows that B is not aware of this fact, that he could not reasonably discover it by any ordinary inspection, and that he would not make the purchase if he knew it. A knows also that B regards him as an honest and fair man, and one who would disclose any such fact if he knew it. A is subject to liability to B for B's pecuniary loss, in an action of deceit."

Comment m, on illustration 9, is as follows:

"*Comment m:* Illustration 9 is taken from Kaze v. Compton (Ky.1955) 283 S.W.2d 204. Cf. Weikel v. Sterns (1911) 142 Ky. 513, 134 S.W. 908 [34 L.R.A., N.S., 1035] (concealed cesspool); Southern v. Floyd (1954) 89 Ga.App. 602, 80 S.E.2d 490 (defect in furnace boiler); Sullivan v. Ulrich (1949) 326 Mich. 218, 40 N.W.2d 126 (termites); Cutter v. Hamlen (1888) 147 Mass. 471, 18 N.E. 397 [1 L.R.A. 429] (premises infected with disease); Herzog v. Capital Co. (1945) 27 Cal.2d 349, 164 P.2d 8 (leaky house); Mincy v. Crisler (1923) 132 Miss. 223, 96 So. 162; Jenkins v. McCormick (1959) 184 Kan. 842, 339 P.2d 8 (defect in floor); Brooks v. Ervin Const. Co. (1960) 253 N.C. 214, 116 S.E. 2d 454 (house built on filled ground); Loghry v. Capel (Iowa 1965) 132 N.W.2d 417 (same); Hothstein [Rothstein] v. Janss Inv. Corp. (1941) 45 Cal.App.2d 64, 113 P.2d 465 (lot filled)."

In the foregoing decisions the sellers were held liable for failure to disclose major defects in the structures involved.

In the case of Kaze v. Compton (Ky. 1955) 283 S.W.2d 204, from which the illustration was taken, the court held the failure of the vendors of a house to disclose to the purchasers the existence of drainage tile which ran beneath the house, which caused water to accumulate under the house and in the yard, was sufficient to entitle the purchasers to recover in a deceit action; and the failure of the vendors to alleviate the condition, although they attempted to do so, would indicate permanency of the defect and refute their claim that the damage was of a temporary character.

Concerning fraudulent concealment the Kentucky court said:

"It cannot be controverted that actionable fraud or misrepresentation by a vendor may be by concealment or failure to disclose a hidden condition or a material fact, where under the circumstances there was an obligation to disclose it during the transaction. If deception is accomplished, the form of the deceit is immaterial. And the legal question is not affected by the absence of an intent to deceive, for the element of intent, whether good or bad, is only important as it may affect the moral character of the representation. Adkins v. Stewart, 159 Ky. 218, 166 S.W. 984; Lose v. Salesberg Realty Co., 233 Ky. 370, 25 S.W.2d 1032; Dennis v. Thomson, 240 Ky. 727, 43 S.W. 2d 18; Curd v. Bethell, 248 Ky. 127, 58 S.W.2d 261." Kaze v. Compton (Ky.) 283 S.W.2d 204, at 207.

The trial court found that defendant Bechtel had little reason to anticipate the water seepage which occurred, and therefore his failure to inform plaintiffs of the presence of the ditch was not fraudulent. The manner in which the drainage tile was installed through the lot and beneath the garage, in close proximity to the basement wall, renders the finding untenable. An experienced builder (defendant had built over one hundred homes in Boise), or one without experience, should have anticipated what occurred. Also, the presence of the ditch, indicating irrigation in the neighborhood by means of surface flooding, should have indicated to an experienced builder that the basement rooms must necessarily be of waterproof construction. It is a fact of common knowledge that water will percolate through pervious soil. Defendant's contention that he had no reason to anticipate seepage of water into the house is contrary to common knowledge.

It also conflicts with his own testimony, as follows:

"Q The fact remains, Mr. Bechtel, that this lower level leaked water, is that correct?

"A When this irrigation water got in there, yes, for as long as the water was there.

"Q If it had been properly prepared, irrespective of the fact that there may have been water on the outside it would not have leaked.

"A No, I think you are wrong there. I don't think the average house, the way we build the average house, it would have made any difference. I think any of them would have leaked if the irrigation water would have leaked—if the irrigation water would have got to them. * * * In case there had been a water table there, it would have been built different. * *

"Q Mr. Bechtel, you knew there was water on this property, did you not?

"A That lot was dry enough in November when we dug that lot. When it was zero weather outside the ground never froze in there to show you there was no previous water in that area.

"Q You put the water underneath the house yourself, did you not?

"A I got in there later, but had I known the water was going underneath that slab. I am not trying to tell you I can build a basement you can float. That is a little bit ridiculous.

"Q You placed the water adjacent to the house * * * yourself?

"A I put the tile through there. I did.

"Q And the water from the ditch then ran through the tile, is that correct?

"A There was no water in the tile at the time we built the house. Irrigation water comes in the ditch in the spring, so the house was completed at the time the water was turned in the ditch.

"Q So you knew that the water would eventually go through this tile.

"A Sure.

"Q Mr. Bechtel, with respect to this tile that you laid under this garage foundation, it was merely butted together, is that correct?

"A That's right.

"Q You make no claim whatever that it was waterproof.

"A I don't.

"Q As a matter of fact, Mr. Bechtel, that water that initially came into the basement came from this, the tiles that were butted together.

"A I would say so.

"Q You would say so.

"A Yes.

"Q So there is no question in your mind at all, as far as the initial water, that it came into the basement from this source.

"A Yes."

Defendant Bechtel testified that he and his real estate agent both told plaintiffs, before they contracted to buy the house, that he was a builder of quality homes and that when finished this would be a quality home. On this the trial court found:

"* * * He did state that the home was built of the finest materials and by the finest workmen available and that it would be a fine home."

Assuming, as the trial court found, that this representation was not made with knowledge of its falsity or with intent to deceive, it was sufficient upon which to base an action in constructive fraud, and also a verbal warranty that the house would be fit for human habitation.

Bechtel also testified that he was quite sure he called plaintiff's attention to the ditch; and that it was visible from the back of the house. However, there was an existing ditch along the east boundary of the lot which carried water to the neighbor on the north, and into which water was diverted from the ditch involved, by means of a head gate located at or near the east boundary line. The ditch along the east boundary may have been the one referred

to, and that ditch may have been observed by plaintiffs, although they testified otherwise. A picture introduced in evidence indicates neither the ditch nor gate was clearly visible because of rubble, shrubs and trees. Concerning the ditch under the garage, the trial court found:

"that they [plaintiffs] did not know of the ditch and any potential danger therefrom and that the circumstances were not such that they should have learned of it."

Defendant did not testify that he called attention to, or advised plaintiffs of, the ditch running under the lot and garage; nor that the ditch was constructed of drainage tile without sealed joints; nor that the basement was not of waterproof construction. These facts were known to defendant and unknown to plaintiffs. They were not discoverable by inspection. Defendant had superior knowledge. Plaintiffs were ignorant of the facts. The parties did not deal at arms length. Defendant dealt from a position of superior knowledge. A confidential relationship arose between the parties. Stearns v. Williams, 72 Idaho 276, 288, 240 P.2d 833 (1952). Plaintiffs relied, and were entitled to rely, upon defendant's representation that the house would be a quality home. The facts essential to a finding of constructive fraud and breach of implied warranty of fitness, are not in dispute. Excepting as to his contention that he had no reason to anticipate seepage of water into the house, defendant admitted all such essential facts. The devious suggestion that plaintiffs turned water into the house to provide a means of avoiding their contract is contradicted by all the evidence, and was repudiated from the witness stand by defendant Bechtel himself.

In Doran v. Milland Development Co., 159 Cal.App.2d 322, 323 P.2d 792 (1958), it was held that the vendor's representation that "the foundation was properly built," when in truth it had not been constructed in compliance with the applicable building ordinance, was a sufficient misrepresentation to support a charge of fraud, though the vendor in good faith believed the ordinance had been complied with. There the court said:

"The positive representation that the foundation was properly built, when it had not been ascertained whether the building laws had been complied with in this respect, falls well within this rule, although appellant believed it to be true. The intent to deceive is not necessary. It is sufficient in this respect if the representation is made with intent to induce the parties to act upon it. Gagne v. Bertran, supra, 43 Cal.2d 481, 488, 275 P.2d 15.

"The claim that the representation that the foundation was properly built was a mere expression of opinion cannot stand in the face of the rule that where the one making the representation is in a position to have 'superior knowledge or special information concerning the subject matter' such representation is regarded as one of fact. 23 Cal.Jur.2d, Fraud and Deceit, § 12, p. 30; Union Flower Market v. Southern California Flower Market, 10 Cal.2d 671, 676, 76 P.2d 503; Gagne v. Bertran, supra, 43 Cal.2d 481, 489, 275 P.2d 15." 323 P.2d at 794.

The representation in the Doran case might also be regarded as an express warranty.

"The parties to this transaction did not stand on equal footing, nor did they have equal means of knowing the truth. The rule that where the parties stand on equal footing and have equal means of knowing the truth, 'trade talk,' 'dealer's talk,' 'seller's talk,' 'seller's statements,' do not amount to actionable misrepresentations, has no application here. 23 Am.Jur. 791, Sec. 33; Koch v. Rhodes, 57 Mont. 447, 188 P. 933; 23 Am.Jur. 787, Sec. 29 and 789, Sec. 32." Weitzel v. Jukich, 73 Idaho 301, 305, 251 P.2d 542, 544 (1953).

In McGhee v. McGhee, 82 Idaho 367, 371, 353 P.2d 760 (1960), this court quoted from 37 C.J.S. Fraud § 2, p. 211, for the distinction there drawn between actual fraud and constructive fraud, and then elaborated:

"In its generic sense constructive fraud comprises all acts, omissions and concealments involving a breach of legal or

equitable duty, trust or confidence and resulting in damage to another. Constructive fraud usually arises from a breach of duty where a relation of trust and confidence exists; such relationship may be said to exist whenever trust or confidence is reposed by one person in the integrity and fidelity of another. In re Arbuckle's Estate, 98 Cal.App.2d 562, 220 P.2d 950 [23 A.L.R.2d 372]; Fipps v. Stidham, 174 Okl. 473, 50 P.2d 680; 37 C.J.S. Fraud § 2, p. 214." 82 Idaho at 371, 353 P.2d at 762.

See also, Lanning v. Sprague, 71 Idaho 138, 227 P.2d 347 (1951).

" * * * Evidence of statements to purchasers that house was well constructed, made by persons holding themselves out as land developers and contractors with apparent knowledge of proper construction methods, and showing that house, pool and patio had been erected on muck foundation by defendants after having been warned not to do so by engineer employed by them, was sufficient to prove prima facie case of actionable misrepresentation and nondisclosure where defect was not visible or discoverable at time of purchase without excavation, even though purchasers inspected prior to purchase and no positive representations were made concerning structural foundation." Ramel v. Chasebrook Construction Company. (Editorial Abstract) (Fla. App.) 135 So.2d 876 (1961).

In Janinda v. Lanning, 87 Idaho 91, 390 P.2d 826 (1964), this court quoted from Obde v. Schlemeyer, supra, when that court quoted Professor Keeton's "Fraud, Concealment and Nondisclosure," 15 Tex. L.Rev. 1, on the maxim "caveat emptor." It was there said that the ancient doctrine in its strict application is no longer in harmony with modern concepts of justice, and that the courts have drawn away from the doctrine in favor of a rule which would "impose on parties to the transaction a duty to speak whenever justice, equity, and fair dealing demand it." In the Janinda case we also quoted from Restatement of Contracts, § 472, Comment b. (1932) as follows:

" ' * * * if a fact known by one party and not the other is so vital that if the mistake were mutual the contract would be voidable, and the party knowing the fact also knows that the other does not know it, non-disclosure is not privileged and is fraudulent.' " 87 Idaho at 96, 390 P.2d at 829.

The Janinda case differs from this in that there the buyer, having been put on warning, inquired of the vendor's agent as to the purity of the water supply. Here the buyer had no warning notice or knowledge of the defective condition of the premises and therefore made no inquiry of the seller or his agent. Nonetheless, the foregoing rule from the Restatement of Contracts would be applicable in this case.

■■ Assuming the evidence was sufficient to support the trial court's finding that Bechtel did not intentionally conceal the defective condition of the property, the issue as to breach of warranty, express or implied, must nevertheless be considered. The pleadings and evidence presenting the issue of fraud were sufficient to present the issue of breach of warranty. The elements of constructive fraud are essentially parallel to those of breach of warranty. On such latter issue the court in its findings stated:

"There are no implied warranties in the sale of real property. Steiber v. Palumbo, 219 Oreg 479, 347 P.2d 978 [78 A.L.R.2d 440] (1959); Annot., 78 ALR2d 446. The sale of this home carried with it, absent an express warranty, no promise that the floor would not leak."

In Steiber v. Palumbo, 219 Or. 479, 347 P.2d 978, 78 A.L.R.2d 440 (1959), relied upon by the trial court, the Oregon court said:

"No decision has come to our attention which permitted recovery by the vendee of housing upon a theory of implied warranty although Allison Dunham, 'Vendor's Obligation as to Fitness of Land for a Particular Purpose,' 37 Minn.Law Rev.

108 (1953) argues that the law will move in this direction in the case of the supplier of new housing. Professor Dunham reasons that in this situation the vendee should have a right to rely on the contractor's skill and judgment that the house is fit for habitation. No such right would arise, as that author concedes, in the resale of used housing since the vendor normally has no greater skill than the buyer." 219 Or. 479, 347 P.2d at 979, 78 A.L.R.2d at 443.

The Oregon court then quotes from the opinion of the Superior Court of New Jersey in Levy v. C. Young Construction Co., 46 N.J.Super. 293, 134 A.2d 717, 719 (1957) [affirmed on other grounds by the Supreme Court of New Jersey, 26 N.J. 330, 139 A.2d 738 (1958)], as follows:

"'As defendant notes, the policy reasons underlying the rule that the acceptance of a deed without covenants as to construction is the cut-off point so far as the vendor's liability is concerned, are rather obvious. Were plaintiffs successful under the facts presented to us, an element of uncertainty would pervade the entire real estate field. Real estate transactions would become chaotic if vendors were subjected to liability after they had parted with ownership and control of the premises. They could never be certain as to the limits or termination of their liability. The rule which we impose in the circumstances of the present action works no harshness on purchasers of real estate. Plaintiffs had an opportunity to protect themselves by extracting warranties or guaranties from the defendant in the contract of sale and by reserving them in the deed. * * *'" 219 Or. 479, 347 P.2d at 980, 78 A.L.R.2d at 443–444.

and also quoted from the dissenting opinion in the same case as follows:

"'Since the defendant was in the business of erecting houses to sell, it represented that it possessed a reasonable amount of skill necessary for the erection of a house. This representation was impliedly made to whomever purchased from the defendant a house erected by it for the purpose of selling. Such a representation is indispensable to effectuate the sale of a house erected, by a developer, for the purpose of selling. Otherwise there would be no sales. A person in the business of building houses to sell is fully aware that a purchaser relies upon such an implied representation. Since the defendant impliedly represented that it possessed a reasonable amount of skill requisite for the erection of a house, it follows that it also impliedly represented that the house was erected in a proper and reasonably workmanlike manner. * * *'" 219 Or. 479, 347 P.2d at 980, 78 A.L.R.2d at 444.

The reasoning of the majority in the New Jersey decision that chaotic uncertainty would pervade the entire real estate field if sellers were subject to liability for implied warranty of fitness, and that the rules of caveat emptor would work no harshness on purchasers of real estate, if fallacious, unrealistic and unjust when applied to the facts of the case before us. In the situation here the imposition of an implied warranty of fitness would work no more uncertainty or chaos than the warranties commonly applied in sales of personal property. Likewise, the statement by the New Jersey court that the plaintiffs had an opportunity to protect themselves by exacting warranties in the contract and reserving them in the deed, has no application to the facts of the case at bar. A buyer who has no knowledge, notice, or warning of defects, is in no position to exact specific warranties. Any written warranty demanded in such a case would necessarily be so general in terms as to be difficult to enforce. It would be like the verbal warranty by defendant in this case, that the house would be a "quality home."

The Supreme Court of New Jersey in affirming the decision of the Superior Court in Levy v. C. Young Construction Co., supra, said:

"We conclude there is no liability here, but for reasons totally different from

those relied upon by the Appellate Division. Whether the widely established rule followed below is harsh and inequitable and should be rejected, or whether it is sound and workable and should be adopted, is a question we are not called upon to decide in light of our view of the case *sub judice*." 139 A.2d 738, at 741.

Bearman in "Caveat Emptor in Sales of Realty—Recent Assaults upon the Rule," 14 Vanderbilt Law Rev. 541, states some of the policy reasons for application of the doctrine in behalf of the builder-vendor; (a) that the vendee's expectations are unrealistic; the builder-vendor would often be saddled with liability for defects that cannot be fairly traced to lack of skill, but rather are the result of the action of the elements, ordinary wear, or want of care on the part of the vendee; and (b) that no insurance is available to cover such a warranty, and if available the cost would be too high. The author, in listing some of the reasons for holding the builder-vendor to a warranty of fitness, says:

"The vendee's strongest argument is reliance. He is admittedly unskilled in the mysteries of house construction and must therefore rely heavily upon the superior skill and training of his builder-vendor. Inspection will be of little use, as has been argued previously, in protecting the vendee, both because of the expense and because the defects are usually hidden. Though the vendor-vendee relationship may not be technically a fiduciary one, the trust placed in the vendor coupled with the relative helplessness of the vendee make it one, contends the vendee, on which the law should impose that high standard." 14 Vanderbilt Law Rev. 574.

Judge Cardozo in "The Nature of the Judicial Process," 150–51, speaking of adherence to precedent, said:

"But I am ready to concede that the rule of adherence to precedent, though it ought not to be abandoned, ought to be in some degree relaxed. I think that when a rule, after it has been duly tested by experience, has been found to be inconsistent with the sense of justice or with the social welfare, there should be less hesitation in frank avowal and full abandonment. * * * There should be greater readiness to abandon an untenable position when the rule to be discarded may not reasonably be supposed to have determined the conduct of the litigants, and particularly when in its origin it was the product of institutions or conditions which have gained a new significance or development with the progress of the years. In such circumstances, the words of Wheeler, J., in Dwy v. Connecticut Co., 89 Conn. 74, 99, express the tone and temper in which problems should be met: 'That court best serves the law which recognizes that the rules of law which grew up in a remote generation may, in the fullness of experience, be found to serve another generation badly, and which discards the old rule when it finds that another rule of law represents what should be according to the established and settled judgment of society, and no considerable property rights have become vested in reliance upon the old rule. * * *'."

The question posed, but left undecided, by the Supreme Court of New Jersey in Levy v. C. Young Construction Co., hereinabove quoted, has since been resolved in favor of the vendee in a decision rendered in 1965—Schipper v. Levitt & Sons, Inc., 44 N.J. 70, 207 A.2d 314. In that case the builder-vendor was held liable, on the theory of breach of warranty of fitness, for injury to a child of the purchaser's lessee, resulting from negligent installation of the hot water system without a mixing valve. In that case the New Jersey court said:

"The law should be based on current concepts of what is right and just and the judiciary should be alert to the never-ending need for keeping its common law

principles abreast of the times. Ancient distinctions which make no sense in today's society and tend to discredit the law should be readily rejected * * *.

"The arguments advanced by Levitt in opposition to the application of warranty or strict liability principles appear to us to lack substantial merit. Thus its contention that *caveat emptor* should be applied and the deed viewed as embodying all the rights and responsibilities of the parties disregards the realities of the situation. *Caveat emptor* developed when the buyer and seller were in an equal bargaining position and they could readily be expected to protect themselves in the deed. Buyers of mass produced development homes are not on an equal footing with the builder vendors and are no more able to protect themselves in the deed than are automobile purchasers in a position to protect themselves in the bill of sale. Levitt expresses the fear of 'uncertainty and chaos' if responsibility for defective construction is continued after the builder vendor's delivery of the deed and its loss of control of the premises, but we fail to see why this should be anticipated or why it should materialize any more than in the products liability field where there has been no such result." 207 A.2d at 325–326.

On pages 326, 327, 207 A.2d, the New Jersey court has collected recent authorities from other jurisdictions limiting or departing from the rule of caveat emptor and adds:

"* * * Whether or not the cases may be differentiated, they undoubtedly evidence the just stirrings elsewhere towards recognition of the need for imposing on builder vendors an implied obligation of reasonable workmanship and habitability which survives delivery of the deed. * * *

"It is worthy of note that although the 1936 edition of Williston, Contracts, upon which Levitt places reliance, stated flatly that there are no implied warranties in the sale of real estate, the 1963 edition took quite a different approach. 7 Williston, Contracts, §§ 926, 926A (3d ed. 1963). In this edition, Professor Jaeger pointed out that although the doctrine of *caveat emptor* is still broadly applied in the realty field, some courts have inclined towards making 'an exception in the sale of new housing where the vendor is also the developer or contractor' since in such situation the purchaser 'relies on the implied representation that the contractor possesses a reasonable amount of skill necessary for the erection of a house; and that the house will be fit for human dwelling.' § 926A, at p. 810. In concluding his discussion of the subject, the author remarked that 'it would be much better if this enlightened approach were generally adopted with respect to the sale of new houses for it would tend to discourage much of the sloppy work and jerry-building that has become perceptible over the years.' § 926A, at p. 818; * * *."

The Schipper decision is important here because: (1) it illustrates the recent change in the attitude of the courts toward the application of the doctrine of caveat emptor in actions between the builder-vendor and purchaser of newly constructed dwellings; (2) it draws analogy between the present case and the long-accepted application of implied warranty of fitness in sales of personal property; and (3) the opinion had the unanimous approval of the participating justices.

In F & S Construction Co. v. Berube (10th cir.) 322 F.2d 782 (1963) a Colorado builder had the soil tested before construction and the consultant approved the proposed foundations. The soil contained a clay which swelled and heaved when wet by rainfall and irrigation of lawns and shrubs. A written warranty was given to the purchaser, but it did not cover the soil defect. Some four or five months after deed and possession were delivered to purchaser, the heaving of the soil cracked the walls and distorted windows, doors,

and floors. There was no finding of negligence or defective workmanship, nor that the builder knew such results would flow from the condition of the soil. The circuit court affirmed a judgment for the purchaser on the ground of breach of implied warranty of fitness.

In September, 1963, the Colorado Supreme Court imposed liability upon the builder of a house for breach of implied warranty of fitness. See Glisan v. Smolenske, 153 Colo. 274, 387 P.2d 260. There again, after delivery of deed and possession, the house was twisted and cracked as a result of soil instability. The court held the implied warranty was not merged in the deed.

Again in 1964 the Colorado court held a builder of a newly completed house liable for breach of an implied warranty of fitness. In Carpenter v. Donohoe, 154 Colo. 78, 388 P.2d 399 (1964), that court said:

"That a different rule should apply to the purchaser of a house which is near completion than would apply to one who purchases a new house seems incongruous. To say that the former may rely on an implied warranty and the latter cannot is recognizing a distinction without a reasonable basis for it. This is pointedly argued in an excellent article, 'Caveat Emptor in Sales of Realty—Recent Assaults upon the Rule,' by Bearman, 14 Vanderbilt Law Rev. 541 (1960–61).

"We hold that the implied warranty doctrine is extended to include agreements between builder-vendors and purchasers for the sale of newly constructed buildings, completed at the time of contracting. There is an implied warranty that builder-vendors have complied with the building code of the area in which the structure is located. Where, as here, a home is the subject of sale, there are implied warranties that the home was built in workmanlike manner and is suitable for habitation." 388 P.2d at 402.

In Weck v. A:M Sunrise Construction Co., 36 Ill.App.2d 383, 184 N.E.2d 728 (1962), the Illinois Appellate Court held a contract to construct a residence implied a warranty of fitness for the intended purpose, and that the warranty survived passing of title by deed. But see Coutrakon v. Adams, 39 Ill.App.2d 290, 188 N.E.2d 780 (1963).

In Jones v. Gatewood (Okl.) 381 P.2d 158 (1963), the court held that the vendor of a house under construction impliedly warrants that it will be completed in a workmanlike manner, and reasonably fit for occupancy as a place of abode. Water seeped through the concrete slab floor because of faulty construction. Judgment for damages was affirmed.

In Hoye v. Century Builders, 52 Wash. 2d 830, 329 P.2d 474 (1958), the defendant represented itself to be an experienced builder. After completion it was discovered there was a "discharge of raw sewage, which condition stubbornly resists correction." The court held that the builder's contract to build a house for plaintiffs impliedly warranted it would be fit for human habitation.

The foregoing decisions all (except the Hoye case) rendered subsequent to the 1959 Oregon decision, relied upon by the trial court, show the trend of judicial opinion is to invoke the doctrine of implied warranty of fitness in cases involving sales of new houses by the builder. The old rule of caveat emptor does not satisfy the demands of justice in such cases. The purchase of a home is not an everyday transaction for the average family, and in many instances is the most important transaction of a lifetime. To apply the rule of caveat emptor to an inexperienced buyer, and in favor of a builder who is daily engaged in the business of building and selling houses, is manifestly a denial of justice. See also, Loma Vista Development Co. v. Johnson (Tex.) 177 S.W.2d 225 (1943); Appendix to Staff v. Lido Dunes, Inc., 47 Misc.2d 322, 262 N.Y.S.2d 544, at 553 (1965).

 The implied warranty of fitness does not impose upon the builder an obligation to deliver a perfect house. No house is built without defects, and defects susceptible of remedy ordinarily would not warrant rescission. But major defects which render the house unfit for habitation, and which are not readily remediable, entitle the buyer to rescission and restitution. The builder-vendor's legitimate interests are protected by the rule which casts the burden upon the purchaser to establish the facts which give rise to the implied warranty of fitness, and its breach. See Schipper v. Levitt & Sons, Inc., supra.

 The ruling of the trial court that there are no implied warranties in the sale of real property is not specifically assigned as error. However, the issue is raised by the general assignment that the judgment is erroneous. Since the issue of constructive fraud through nondisclosure, involves all the essential elements of breach of implied warranty, appellants' brief is sufficient to present the latter issue. Cf. Herzog v. City of Pocatello, 83 Idaho 365, 363 P.2d 188 (1961).

"Relief will be granted in any case where the pleading and proof entitle the plaintiff to any relief whether legal or equitable. Murphy v. Russell & Co., 8 Idaho 133, 151, 67 P. 421, 427; Anderson v. War Eagle Consol. Min. Co., 8 Idaho 789, 72 P. 671; Rauh v. Oliver, 10 Idaho 3, 77 P. 20; Bates v. Capital State Bank, 21 Idaho 141, 121 P. 561; City of Pocatello v. Murray, 21 Idaho 180, 194, 120 P. 812; Poncia v. Eagle, 28 Idaho 60, 152 P. 208; Carroll v. Hartford Fire Ins. Co., 28 Idaho 466, 154 P. 985; Gridley v. Ross, 37 Idaho 693, 217 P. 989; Casady v. Scott, 40 Idaho 137, 237 P. 415; Mosely v. Boyd, 167 Okl. 485, 30 P.2d 897; Reed v. Woodmen of the World, 94 Mont. 374, 22 P.2d 819." Addy v. Stewart, 69 Idaho 357, 362, 207 P.2d 498, 501 (1949).

"It is also the rule in this state (except in default cases) that the court will grant all proper relief consistent with the case made and embraced within the issues, whether the particular relief be prayed for or not. Sec. 10–704 I.C.; Burke Land & Livestock Co. v. Wells Fargo & Co., 7 Idaho 42–56, 60 P. 87; Dover Lbr. Co. v. Case, 31 Idaho 276, 170 P. 108; Schlieff v. Bistline, 52 Idaho 353, 15 P.2d 726; Swanstrom v. Bell, 67 Idaho 554, 186 P.2d 876; Stivers v. Sidney Mining Co., 69 Idaho 403, 208 P. 2d 795." Anderson v. Whipple, 71 Idaho 112, 122, 227 P.2d 351, 357 (1951).

"Under our more modern practice, a party's cause will not be dismissed for a defect of form or procedure. The district court, having jurisdiction both at law and in equity (Const. Art. 5, §§ 1 and 20) will grant all proper relief consistent with the case made, and embraced within the issues tried, whether prayed for or not. I.C. § 10–704; Boesiger v. Freer, 85 Idaho 551, 381 P.2d 802 (1963); * * * Smith v. Shinn, 82 Idaho 141, 350 P.2d 348 (1960); * * *." Gem-Valley Ranches, Inc. v. Small, 90 Idaho 354, 411 P.2d 943, 950 (1966).

Also: Jones v. State, 85 Idaho 135, 376 P.2d 361, 3 A.L.R.3d 1158 (1962); Paffile v. Sherman, 84 Idaho 63, 368 P.2d 434 (1962); Sims v. Purcell, 74 Idaho 109, 257 P.2d 242 (1953); Haener v. Albro, 73 Idaho 250, 249 P.2d 919 (1952).

If it may be said that this case was not submitted to the trial court on the theory of breach of warranty, nevertheless, that is not a sufficient reason to deny any relief to plaintiffs. The evidence submitted on both sides on the issue of fraud, was also competent, relevant and material to the issue of breach of warranty of fitness. Hence, the latter issue was actually tried; and it was expressly determined by the trial court. Any defects or irregularities in pleadings are unimportant at this stage in view of IRCP 15(b). See also I.C. § 10–704. The obvious purpose of the rule that a party will be held to the theory upon which he tried his case below, is to prevent prejudice to the opposite party by surprise, or by the presentation of new

issues on appeal. Here the issue of breach of warranty is not new, and where a new trial is ordered no prejudice by way of surprise can result.

"Orderly procedure would seem to require that the case be remanded for a new trial so that the parties may properly frame the issues, which they seek to present here, and in order that such issues may be fully tried before they are finally determined. Commercial Standard Ins. Co. v. Remay, 58 Idaho 302, 72 P.2d 859, 120 A.L.R. 1." Loomis v. Church, 76 Idaho 87, 95, 277 P.2d 561, 565 (1954).

The judgment in favor of Modin is approved. The judgment in favor of Bechtel is reversed, and the cause is remanded for a new trial of the issues between plaintiffs and Bechtel.

Costs to Modin against plaintiffs.

Costs to plaintiffs against Bechtel.

McFADDEN, C. J., and McQUADE and SMITH, JJ., concur.

SPEAR, Justice (concurring specially).

I concur in the result reached in the majority opinion, i. e., that the action should be remanded to the trial court for a new trial on the issues of constructive fraud and/or implied warranty of fitness for habitation. In my opinion, however, these principles are so akin to fraud, the burden of proving such constructive fraud or the breach of such implied warranty should be the same as that required of the plaintiff in an action on express fraud. In other words, the plaintiffs should be required to prove the breach or the elements of constructive fraud by clear and convincing evidence, rather than merely a preponderance of the evidence. See Chester B. Brown Co. v. Goff, 89 Idaho 170, 403 P. 2d 855 and cases cited therein, p. 175; Nelson v. Hoff, 70 Idaho 354, 218 P.2d 345; Walker v. Nunnenkamp, 84 Idaho 485, 373 P.2d 559.