**J. T. BANNER, d/b/a J. T. Banner and Associates, Appellant (Defendant below),**

v.

**TOWN OF DAYTON, a municipality, Appellee (Plaintiff below).**

No. 3824.

Supreme Court of Wyoming.

Sept. 8, 1970.

Rehearing Denied Oct. 15, 1970.

Smith & Stanfield, Laramie, for appellant.

Burgess, Kennedy & Davis, Sheridan, for appellee.

Before GRAY, C. J., and McINTYRE, PARKER, and McEWAN, JJ.

Mr. Justice PARKER delivered the opinion of the court.

On March 29, 1968, the Town of Dayton filed a complaint against defendant alleging that on October 8, 1956, the parties entered into a contract by which defendant was to supervise and provide engineering services for the construction and laying of a water line from the Tongue River, as the source, to Dayton; that all plans and specifications were either prepared or approved by defendant and all work done under his supervision; that commencing August 3, 1964, numerous leaks developed along the entire length of the line, the cause of which was electrolysis resulting from an improper type of pipe for existing soil conditions, or improper protection of the pipe against electrolysis, or improper laying of pipe, or a combination thereof; that defendant approved the type of pipe used, the method of its protection, and supervised and approved its laying; that defendant negligently failed and neglected to perform adequate soil resistivity tests to determine the soil conditions; that plaintiff's expense in attempting to seal the leaks amounted to $1,645.42; that plaintiff was required to replace the line in its entirety at an expense of $120,000; and that defendant was negligent in (1) failing to make the necessary soil resistivity tests to determine what type of pipe and coating or protection should be required for the soil conditions, (2) approving a type of pipe which

was inadequate for the soil conditions, (3) approving the type of coating or protection placed on the pipe for the soil conditions, and (4) supervising and approving the laying of the pipe, including supervision and approval of the backfill methods—seeking judgment for $121,645.42. Defendant answered, admitting the contract, the preparation or approval of all plans and specifications for the project, but claiming that all this was done as a result of consultations and conferences with plaintiff and that it had assumed all risks. Defendant alleged he performed various inspection services in connection with all work rendered; denied other matters; pleaded that the complaint failed to state a claim; and also alleged affirmatively that the claim was barred by §§ 1–16, 1–17, and 1–18, W.S.1957 (statutes of limitations); that plaintiff had failed to take necessary and reasonable action to mitigate damages; and that he was not required to perform with respect to testing soil resistivity or any other services relating to protection of the system against electrolysis.

Defendant's motion for summary judgment was denied, and the cause proceeded to trial, at the conclusion of which the court although not so requested under Rule 52(a), W.R.C.P., filed special findings of fact and conclusions of law, found generally for the plaintiff and against the defendant, and entered judgment against him for $25,806, from which this appeal has been taken.

Defendant here contends that (1) the trial court erred in determining the action was not barred by § 1–18, (2) while that court adopted the proper standard of care for a consulting engineer in this State, the evidence did not substantiate that two of the witnesses had sufficient knowledge of recognized Wyoming standards for consulting engineers to qualify them to comment with respect to defendant's negligence, (3) in considering the evidence most favorable to plaintiff, such evidence wholly fails to substantiate by a preponderance that defendant was negligent in the performance of his duties with respect to the design, supervision, and installation of the water distribution line, and (4) damages awarded were excessive by reason of plaintiff's failure to mitigate.

There seems no necessity of reciting the factual situation since, with one exception, there is tacit agreement concerning all facts, including the existence of the contract, the preparation and approval by defendant of the plans and specifications for the water line, his supervision of the work, and the later failure of the water line. The only disagreement or confusion concerns the statements made to the Dayton council about electrolysis, which aspect will be discussed later.

## STATUTE OF LIMITATIONS

Defendant's first challenge centers on the rejection of his argument that plaintiff's action was barred by the statute of limitations. The trial court in its findings on this phase of the case said:

"The Court prefers the rule advocated by the Plaintiff that it should not be precluded by the harsh rule that where it has no way of knowing about the wrongful act until an injury is suffered that the statute of limitations should start to run from the time when the injury is sustained. In this particular case, the Defendant would have no way of knowing the work was defective until it sustained some perceptible injury. The water line was underground where it could not be seen and the forces of electricity were operating in a way that could not be observed. The rule otherwise would practically preclude forever, any relief from professional negligence of engineers, where latent defects take time to appear, in their long term product.

"The Plaintiff started patching in the fall of 1964, shortly after it discovered its first leaks. In the fall of 1965, wet spots appeared and it was then that Mr. Pilch, an engineer of Sheridan was called

and after an investigation by a corrosion man from Denver, it was determined that the pipe was being eaten away by electrical forces. In the spring of 1966, the Defendant was contacted. It must be realized that the members of the Town Council are laymen, were justifiably mystified by the cause of the damage that was being wrought. The members had hired professional help because of their inability. It took almost 4 years from the time of the discovery of the first injury until March of 1968 to get the law suit filed. The Court finds that the suit was filed within the four year Statute of Limitations.

"The case of Town Council of the Town of Hudson v. Ladd, 37 Wyo. 419, 263 P. 703 is useful in its equitable view that there could be no cause of action until there was injury. There, work was done in 1914, but damage did not occur until 1925. The Court held that the Statute commenced to run in 1925."

We must consider whether this finding was erroneous as is contended in the appeal or was a proper disposition of the matter under the circumstances.

There has not been unanimity of viewpoint among courts concerning the time a statute of limitation begins to run in suits charging negligent performance of professional duties. As is frequently true in litigation involving controversial, pivotal questions, the outcome of each suit often depends on its unique facts. Authorities have on occasion pointed out that the law relating to the liability of architects and engineers, two professions which have frequently been held to be controlled by similar principles [1] have evolved from and are similar to those applicable to other professions. Prosser, Law of Torts, p. 164 (3 ed.), says:

"Professional men in general, and those who undertake any work calling for special skill, are required not only to exercise reasonable care in what they do, but also to possess a standard minimum of special knowledge and ability. Most of the decided cases have dealt with physicians and surgeons, but the same is undoubtedly true of dentists, pharmacists, psychiatrists, attorneys, architects and engineers, accountants, abstractors of title, and many other professions * *." [2]

It seems well settled that in recent years there has been a tendency to increase the obligations and liabilities of architects and engineers. [3]

Defendant's counsel cites the case of Wills v. Black and West, Architects, Okl., 344 P.2d 581, pointing out that there the architects submitted a letter of proposal in connection with plans, specifications, letting contract, and supervision of building construction, representing the building would be designed and planned in a workmanlike and sufficient manner, and notes that in the suit which resulted the court upheld the architects' contention that the action was barred since the building had been certified and accepted by the owner more than five years prior to the proceedings. Defendant calls attention to the court's statement, 344 P.2d at 584, "If a cause of action existed at any time, it accrued at the time the building was completed and accepted by the plaintiff * * * and the statute of limitations began running, unless the defendants were guilty of false and fraudulent representation which tolled the statute." We agree that on its face the opinion would seem to uphold defendant's position here. However, in that case as in Wellston Co. v. Sam N. Hodges, Jr. and Co., 114 Ga.App. 424, 151 S.E.2d 481, a suit against the architect and general contractor for damages resulting from negligent design and construction of a building, it is clear that at the time the

---

1. 22 Ark.L.Rev. 454.

2. For valuable background as to duties, liabilities, skill and care of architects, see 5 Am.Jur.2d Architects § 8; 6 C.J.S. Architects §§ 17–19; Annotation, 25 A.L.R.2d 1085.

3. 12 Vand.L.Rev. 711; 55 Cal.L.Rev. Pt. II 1361; 22 Ark.L.Rev. 454.

buildings were completed both injury and damage existed.

In the instant case, the trial court found there can be no cause of action until there is injury. This principle was observed in Hunt v. Star Photo Finishing Company, 115 Ga.App. 1, 153 S.E.2d 602, 605, an action against the designer-engineer for damages as the result of the collapse of a roof:

> " 'The test to be applied in determining when the statute of limitations begins to run against an action sounding in tort is in whether the act causing the damage is in and of itself an invasion of some right of the plaintiff, and thus constitutes a legal injury and gives rise to a cause of action. If the act is of itself not unlawful in this sense, and a recovery is sought only on account of damage subsequently accruing from and consequent upon the act, the cause of action accrues and the statute begins to run only when the damage is sustained, but if the act causing such subsequent damage is of itself unlawful in the sense that it constitutes a legal injury to the plaintiff, and is thus a completed wrong, the cause of action accrues and the statute begins to run from the time the act is committed, however slight the actual damage then may be.' Barrett v. Jackson, 44 Ga.App. 611, 162 S.E. 308; Silvertooth v. Shallenberger, 49 Ga.App. 133(2), 174 S.E. 365. Generally in a tort action the statute of limitation begins to run when damage from the tortious act is actually sustained. * * * *"

Further analysis of this rule and its application is found in 54 C.J.S. Limitations of Actions § 168; 51 Am.Jur.2d Limitation of Actions § 107; see also In re Talbott's Estate, 184 Kan. 501, 337 P.2d 986, 989; Kitchener v. Williams, 171 Kan. 540, 236 P.2d 64, 69; Howard v. United Fuel Gas Company, S.D.W.Va., 248 F.Supp. 527, 531.

The reasoning upon which such holdings are grounded has much in common with the rationale of the "discovery rule"—so frequently discussed in cases of alleged malpractice [4]—and applied by the trial court in this case. As is shown in Annotations, 74 A.L.R. 1317, 1319; 144 A.L.R. 201, 212; 80 A.L.R.2d 368, 387, some courts have rigidly held that in determining when a statute of limitation begins to run against a malpractice action it is immaterial when the person discovered or by the exercise of reasonable diligence could have discovered malpractice with the resulting injury. Such holdings naturally deprive many persons of a remedy when they have been wronged and, as the trial judge's findings here indicated, bring about an inequitable result. Other courts have found that a variety of tort actions fall within a class of cases where *" 'the period of limitation may and should fairly and justly be said to begin to run when the plaintiff knows or has reason to know' "* the existence of the cause of action. New Market Poultry Farms, Inc., v. Fellows, 51 N.J. 419, 241 A.2d 633, 635. Such a result is consistent with the holding of this court in the case of Town Council of Town of Hudson v. Ladd, 37 Wyo. 419, 263 P. 703, wherein the town was sued by plaintiff whose land was damaged in 1925 because of work done by the town in changing the channel of a stream in 1914, and we held that the action accrued at the time of the resulting damage, not at the time of the excavation. As defendant in argument points out, the Ladd case dealt with a type of action quite dissimilar from the one before us, but in our view the focal statement there is equally applicable here: "The line of demarcation seems to be in the certainty or uncertainty of injury to plaintiff's property." 263 P. at 705. Incidentally, any argument that one claiming relief under such circumstances has the advantage of delay is probably offset by

---

4. New Market Poultry Farms, Inc., v. Fellows, 51 N.J. 419, 241 A.2d 633, 636; Rosenau v. City of New Brunswick, 51 N.J. 130, 238 A.2d 169, 173; Morgan v. Grace Hospital, 149 W.Va. 783, 144 S.E.

2d 156, 161; Fort Myers Seafood Packers, Inc., v. Steptoe and Johnson, 127 U.S. App.D.C. 93, 381 F.2d 261, 262, 18 A.L.R. 3d 974.

the increased difficulty he will have in proving negligence after the passage of time.

■ Bearing in mind the overall law on the subject and our holding in the Ladd case, we find no tenable basis for overturning the trial court on this aspect. In so saying, we do not overlook the argument of defendant that although strict application of the limitation statute may work harshly against those who have had insufficient time to discover the damage the legislature "has undoubtedly weighed carefully the inequities which would result from forcing a person to forever *warrant* work which he has performed." (Emphasis supplied.) Of course, counsel misspeaks in that respect since neither the trial court's holding nor the rationale it employed requires warranty of the work but rather merely imposes an obligation to use reasonable care. Further, we cannot agree with counsel's suggestion that the legislature has resolved the problem or with the statement that there was evidence before the trial court upon which it could have based a finding that the plaintiff had reason to know of the existence of its cause of action "well before March 29, 1964."

## EVIDENCE CONCERNING STANDARD OF CARE

While defendant concludes that the trial court in its determination followed and substantially adopted a standard of conduct similar to that suggested by 2 ALI Restatement (Second), Torts 2d § 299A and appropriate for determining the negligence of a Wyoming consulting engineer, he suggests that the court did not reduce the standard to a concise recital such as that set forth in the Restatement:

"Unless he represents that he has greater or less skill or knowledge, one who undertakes to render services in the practice of a profession or trade is required to exercise the skill and knowledge normally possessed by members of that profession or trade in good standing in similar communities."

Defendant notes the applicability of that section to the profession of engineers as observed in comment "b" thereunder and quotes with approval the first paragraph of comment "g," overlooking the limitations placed on that statement by the next paragraph. The significance of the omission becomes apparent from consideration of the full comment, which reads:

"*g. Type of community.* Allowance must be made also for the type of community in which the actor carries on his practice. A country doctor cannot be expected to have the equipment, facilities, experience, knowledge or opportunity to obtain it, afforded him by a large city. The standard is not, however, that of the particular locality. If there are only three physicians in a small town, and all three are highly incompetent, they cannot be permitted to set a standard of utter inferiority for a fourth who comes to town. The standard is rather that of persons engaged in similar practice in similar localities, considering geographical location, size, and the character of the community in general.

"Such allowance for the type of community is most frequently made in professions or trades where there is a considerable degree of variation in the skill and knowledge possessed by those practicing it in different localities. It has commonly been made in the cases of physicians or surgeons, because of the difference in the medical skill commonly found in different parts of the United States, or in different types of communities. In other professions, such as that of the attorney, such variations either do not exist or are not as significant, and allowance for them has seldom been made. A particular profession may be so uniform, in different localities, as to the skill and knowledge of its members, that the court will not feel required to instruct the jury that it must make such allowance."

It is the contention of defendant that there was not sufficient evidence before the court

to support its determination that plaintiff's expert witnesses possessed sufficient knowledge of the recognized standards of consulting engineers in Wyoming in 1956. As is implicit in a consideration of the above-quoted comment "g," overreliance is here placed on precedents from the medical profession; even were that not so the standards pertinent in this case are those of the person heading a relatively large firm of consultants whose activities cover an extensive area, at least that of the entire State, so that on the face of the matter and without a showing to the contrary there is little reason for application of a locality rule. Moreover, nothing was before the court which would reasonably show that the standards for the installation of pipe should vary from one state to another.[5]

In any event, it would seem that argument as to the use of a locality rule in the determining of an applicable standard of care is here rendered academic by the defendant's own testimony that he was familiar with the need to cathodically protect a steel water line. He told of his previous experience in 1946 of supervising the installation of a water line for the City of Laramie and tests which were made on the soil there and of the subsequent corrosion by electrolysis which took place in that line. In his affidavit supporting his motion for summary judgment, he said that the City Council of Dayton met on or about September 5, 1956, and that he then discussed with it "the matter of electrolysis and cathodic protection in determining whether the Town of Dayton should purchase asbestos cement or steel pipe for the projest" and that the council ultimately selected steel pipe, the subject of this litigation, primarily because of the lesser costs involved, together with the fact that the line to be replaced was steel and had been in place and had satisfactorily served the needs of the town for a period in excess of thirty years.[6] In his brief he says it is undisputed that the line was damaged from corrosion resulting from electrolysis and continues, "there is no dispute regarding the fact that Defendant did consider the problem of corrosion in the design and installation of the water line." All this seems an argument that in effect he should not be judged by a standard which required care to avoid corrosion by electrolysis. It is our view that the court departed from neither precedent nor fairness in saying that the standard of the professional conduct applicable in the case was that of the community of Wyoming. It requires no extended legal philosophy to justify holding a professional man, who is aware of a danger or difficulty attendant in an undertaking by him, obli-

5. A quoted portion of Paxton v. Alameda County, 119 Cal.App.2d 393, 259 P.2d 934, 938, relating only to an instruction given by the trial court, neither approved nor disapproved by the reviewing court, is unpersuasive.

6. Seemingly this is inconsistent with his later testimony:
"* * * did you personally have any discussion with the town council regarding the use of the steel pipe which you have said you selected * * *? * * A The only times that we had discussions with the entire council to my memory, of course, was at a council meeting and I think that the major discussion occurred at a meeting in September after we had taken bids on the alternate sizes and alternate types. We took bids both on eight inch and ten inch diameters and both asbestos and steel pipe.

"Q Would you relate what those conversations were with respect to corrosion. My question was, did you ever discuss, with the council the selection of your pipe with respect to corrosion? A I don't believe we ever discussed this on the basis of corrosion. There was no corrosion existing on the old line that I know of and this was verified by a number of the people on the council, that it had been in there forty some years and was still in excellent condition and we did not discuss corrosion as we see it now at all. * * * I don't remember discussing corrosion specifically at all.
*     *     *     *     *
"Q Was it your conclusion that because there had been no corrosion of the old pipe that there would be no corrosion of the new pipe? A That is correct."

gated at minimum to discuss the difficulties with his client as a basis for avoiding the problem or ameliorating the situation. In any event, the proving an applicable standard of care in the instant situation became unnecessary when defendant made it clear that he was aware of the danger, even though he did not profess to be an expert in the field of protecting against electrolytic corrosion.

## SUFFICIENCY OF THE EVIDENCE

Counsel says the gravamen of the charge of defendant's negligence was the allegation in the petition that (1) he failed to make the necessary resistivity tests to determine what type of pipe or what type of coating or protection was required for the conditions; (2) he approved the type of pipe which was inadequate for the conditions; (3) he approved the type of coating and protection on the pipe; (4) he supervised and approved the laying of the pipe and the backfill methods. We agree except that we think this must be amended to conform to the evidence showing the engineer's failure to inform plaintiff's officers of the potential difficulty.

Defendant concedes that he considered the problem of corrosion in his design and installation of the water line. In his brief he alleges that prior to such design and installation he determined by discussion with the officials of the town that there was an existing six-inch steel line which had been used approximately forty-seven years still in good condition; that he made visual observations of the old line in three different places at the exposed end of the line near the settling basin and in two test holes which he had dug therein, examining the pipe and scratching the surface with other metal to determine if any deterioration or corrosion of the line had taken place; that he made visual examination of the soil by walking the area, examining the terrain and texture of the soil and noting the natural drainage; that after these investigations he selected the steel pipe specifications of American Water Works Association standards having similar but not identical type joints as the old line; that he installed the line in the same depth and often in the same location as the former line; and that the backfill operations were conducted in a careful manner. In so saying he is at some pains to explain that he did not duplicate the old pipe and in fact could not do so because of unavailability. We find nothing in his explanation or in the evidence to support his conclusion that he made "a reasonable investigation of the circumstances existing" before he proceeded with the contract and installation. There is no showing that such cursory steps as were taken provided any real information of the probable danger or a method of avoiding it. In his argument he repeatedly without any justification in the record injects the idea that he is being called to account for failing to advise the town to conduct a resistivity test and to apply cathodic protection, completely avoiding the point that there is no evidence whatever of his having given his client the benefit of his previous knowledge that corrosion by electrolysis was an important consideration in the installation of a water line[7] or of the further fact that the pipe selected was different from that used in the old line in various respects, which undoubtedly would affect the corrosion by electrolysis. The refrain throughout the presentation thus seems to be that he has been found negligent for not advising the town to expend additional sums to acquire resistivity tests. This, of course, is not the point in the case or the basis for the judgment any more than his other complaint in the appeal, that the consulting engineer here is being judged by future standards of care rather than those applicable in 1956.

Analysis of the court's findings of fact and conclusions of law indicates that

7. The importance of electrolysis on the corrosion of water pipe was a common subject of discussion among the profession at the time in issue as indicated by the article and accompanying bibliography in 45 (Pt. 2) Journal, American Water Works Association 1281 (1953).

the standard of conduct applied was in reality a standard of minimum professionally acceptable conduct as of the date of the contract. The court found that defendant did not meet such a standard in that he failed to substantially duplicate the old line or to recommend a line of noncorrosive material and that a member of the profession purporting to rely on past experience is obligated to consider the dissimilarity of factors in the past and present circumstances. The court made specific findings that defendant's contention of being limited as to expenditures was not borne out by the testimony and that under the circumstances the choice of the materials to be used was necessarily that of the consulting engineer. The record provides ample evidentiary support for such findings and conclusions and the contention against the propriety of the judgment on this ground is without merit.

## FAILURE TO MITIGATE

Defendant argues that it was "probable and indeed quite likely that had appropriate action been taken by the Town of Dayton upon discovery of the problem in 1963 or 1964, cathodic protection would have been applied at that time, saving the line for its anticipated life." The most that is argued on this point is the *probability* or likeliness that the life of the lines might thus have been extended. No authority is presented to warrant the mitigation of damages on this basis, and it is fundamental that such may be allowed only if there is presented a reasonable estimate of how much the damages could have been lessened. Schmidt v. Schabow, 265 Wis. 154, 60 N.W. 2d 735, 738, 38 A.L.R.2d 1449; 25A C.J.S. Damages § 162(1), p. 79; 22 Am.Jur.2d Damages § 297. The rationale on this facet of the appeal is entirely speculative.

Affirmed.