19075

Frank William RUTLEDGE, Respondent, v. James E. DODENHOFF, Jr., and Paul B. Costner, Jr. d/b/a D&C Builders, Appellants.

(175 S. E. (2d) 792)

*Messrs. Younts, Reese & Cofield,* of Greenville, *for Appellants,*

*Messrs. Leatherwood, Walker, Todd & Mann,* of Greenville, *for Respondent,*

*Messrs. Younts, Reese & Cofield,* of Greenville, *for Appellants, in Reply.*

July 8, 1970.

LEWIS, Justice:

This is an appeal by defendants from a judgment recovered against them, as the builder-vendor of a new house, for damages sustained by plaintiff the purchaser, from overflows from a septic tank installed by defendants as a part of the new construction.

Plaintiff alleged that the overflow from the septic tank was due to either defective design or installation of the sewerage disposal system. The case was tried and the issue of liability submitted to the jury on the legal theory that the defendants, as a builder-vendor of a new house, impliedly warranted the fitness of the building for the purposes and use for which it was intended. The exceptions preserve for review the contentions interposed by defendants at the trial that (1) the evidence conclusively shows that plaintiff's damages resulted from causes for which defendants were not responsible; and that, in any event, (2) the trial judge erred in submitting the case to the jury on the theory that there was an implied warranty of fitness in the sale of the house.

Defendants first contend that the trial judge erred in refusing their timely motion for a directed verdict on the ground that the evidence conclusively shows that the sewer-

age disposal system in the house was properly designed and installed and that plaintiff's damages resulted from causes for which they were not responsible. In disposing of this question we are required to view the evidence and the reasonable inferences to be drawn therefrom in the light most favorable to the plaintiff.

Defendants, who admittedly held themselves out to the public as experienced and competent builders, sold to plaintiff on February 4, 1967, for the sum of $23,500.00, a new house which had been constructed by them. The sewerage disposal from the house was through a septic tank, there being no municipally operated sewerage system available in the area. After plaintiff and his family lived in the house for approximately eight months, the septic tank overflowed on five separate occasions, the first time in September 1967 and subsequently in December 1967, February 1968, May 1968, and September 1968. The house was described as a tri-level structure consisting of a basement, first floor, and a second floor, with bathrooms located in the basement and on the top floor level. When the septic tank overflowed, it caused the water and contents to back into the house through the commodes and shower stalls, including those on the top floor level, causing considerable damage to the house and the furniture. Upon the failure of the defendants, after notice, to remedy the situation, this action was instituted to recover the damages sustained. A verdict was rendered in plaintiff's favor in the amount of $2,000.00.

The septic tank and the field drains from it were installed to the rear of the house, which, due to the fact that the lot sloped to the front, placed them, as described in the testimony, above "the level of the house." There was testimony that the underground water level was higher in the community where the house was constructed than in other areas, which was known to defendants but not to the plaintiff. Normally, the best procedure in installing a septic tank is to place it and the necessary field drains below the level of the

house, and this is especially true in areas where the underground water level is high. This result could have been obtained in this case by installing the septic tank and drains to the front of the house since the terrain was considerably lower there than at the rear. In fact, it was inferentially conceded by one of the defendants that the proper place to locate the septic tank was to the front of the house because of the slope of the lot from the rear to the front and the high underground water level. He stated that this was not done because the officials of the County Health Department decided that it should be installed to the rear of the house. Although he was aware of the foregoing facts, he made no suggestion to the health authorities that the proposed location of the septic tank be changed.

Plaintiff testified that the field drain lines from the septic tank had a tendency to point uphill rather than down, and that the tank overflowed in both dry and wet weather but "more frequently in wet weather."

After a septic tank and field drains are installed, they are covered with dirt and obscured from view. A prospective purchaser of the new house therefore had no feasible way to inspect the sewerage disposal system to determine if it was properly installed. It is undisputed that the system was a necessary and integral part of the house sold by defendants.

We think that the testimony made a jury issue as to whether the septic tank and field drains were properly installed. Defendants were aware that the underground water table was higher in the area in question than in other places; that the land sloped from the septic tank, as installed, toward the house; and that, under the facts known by them, a proper installation required that the septic tank be installed to the front rather than to the rear, thereby placing it below the level of the house instead of above. It is inferable that the sewerage disposal system was installed in such a manner as to cause the drainage therefrom to be forced toward the house instead of away from it. There was

ample testimony to warrant the jury in finding that such constituted a defective installation.

The record sustains the inference that the underground water level rose, during the times in question, causing water to back into the sewerage disposal system and overflow through the septic tank into the house. Defendants argue that plaintiff's damages were caused by fluctuations in the water level for which they were not responsible. There is nothing to indicate that the use of the system for eight months caused it to overflow. We think that the evidence sustains the conclusion, apparently reached by the jury, that the rise in the underground water level caused the overflow of the septic tank into the house because of the manner in which defendants installed the system. Defendants knew of the high water level in the area and it is inferable that the conditions existing during the times of the overflow were not unusual or unexpected. The testimony shows that there were precautions which should have been taken in the installation of the system to guard against such an occurrence as experienced in this case. These were not taken and a jury issue was presented as to whether the system was installed in a proper manner under the conditions which defendants knew existed in the area and as to whether plaintiff's damages resulted from a defective or improper installation.

The next question to be decided is whether defendants, as the builder-vendor of a new dwelling, may be held liable to the purchaser on the basis of implied warranty for loss or damage caused by a defective condition of the building. If so, the submission of the issue of liability to the jury on that theory was proper.

The doctrine of *caveat emptor,* inapplicable to sales of personalty, has, in the absence of fraud and misrepresentation long governed the obligations of the parties in the sale of real estate in this State. *Frasher v. Cofer,* 251 S. C. 112, 160 S. E. (2d) 560. The question here is whether the doctrine applies so as to preclude an implied warranty in the sale of a new house by the builder.

In recent years, the efficacy of *caveat emptor* to accomplish justice, when applied to the sale of new houses by the builder, has been subjected to serious question and rejection by many courts in the light of modern developments in the residential building trade. Distinction has been drawn between the usual, normal sale of lands, and old buildings and a transaction where the vendor is also the builder of a new structure. We have recently recognized such distinction in *Rogers v. Scyphers,* 251 S. C. 128, 161 S. E. (2d) 81. We there stated that, where the vendor is also the builder, he is, by the weight of modern authority, held liable for damages and injuries occurring after the surrender of title and possession, on one or more of three theories: (1) implied warranty, (2) an imminently dangerous condition caused by negligence in construction, and (3) concealment or failure to disclose to the vendee any condition which involves unreasonable risk to persons on the land under the conditions set forth in Restatement, Torts (2d), Section 353.

In *Rogers,* we sustained liability of the builder-vendor of a new dwelling for personal injuries sustained from a defective folding stairway upon either of the theories stated in two (2) and three (3) above. The theory of implied warranty was not there involved.

The decided trend of modern decisions is to restrict the application of *caveat emptor* and to hold it inapplicable to sales where the vendor is also the builder of a new structure. These decisions hold that a builder-vendor may be held liable for loss or damage caused by a defective condition in the building on the theory of breach of an implied warranty of workmanship and fitness for intended use. Annotation: 25 A. L. R. (3d) 383, 413; *Bethlahmy v. Bechtel,* 91 Idaho 55, 415 P. (2d) 698; *Waggoner v. Midwestern Development, Inc.,* S. D., 154 N. W. (2d) 803.

The rationale of the decisions which hold the builder-vendor of a new house liable on the basis of an implied

warranty is that the seller and buyer are not on an equal footing in such a transaction. The foregoing annotation soundly points out that the primary purpose of the transaction is to provide the purchaser with a habitable dwelling and the transfer of the land is secondary. The seller holds himself out as an expert in such construction and the prospective purchaser, if he buys, is forced to a large extent to rely on the skill of the builder. This is true because the ordinary purchaser is precluded from making a knowledgeable inspection of the completed house not only because of the expense and his unfamiliarity with building construction, but also because the defects are usually hidden rendering inspection practically impossible. Under such circumstances, the purchaser is at the mercy of the builder-vendor.

The doctrine of *caveat emptor* is inapplicable to such a transaction as the above. Both the seller and purchaser know that the essence of the transaction is the purchase of a habitable dwelling and that a knowledgeable inspection by the buyer is impossible. Since this is true, it is proper that there should be an implied warranty that the dwelling is fit for the purposes for which it is intended. We therefore hold that in the sale of a new house by the builder-vendor there is an implied warranty that the house was built in a reasonably workmanlike manner and is reasonably suitable for habitation.

The trial judge properly submitted the issue of liability to the jury on the theory of an implied warranty.

Finally, defendants contend that they installed the septic tank and field drains therefrom in accordance with the specifications of the Greenville County Health Department and that such fact should relieve them from liability.

The short answer to the foregoing contention is that this action for breach of an implied warranty is not based on negligence. There was an implied warranty which bound the defendants absolutely for the existence of the warranted

qualities in the building, irrespective of any fault on their part. *Patterson v. Orangeburg Fertilizer Co.,* 117 S. C. 140, 108 S. E. 401.

The judgment of the lower court is accordingly affirmed.

Moss, C. J., and BUSSEY, BRAILSFORD and LITTLEJOHN, JJ., concur.