ABC BUILDERS, INC., a Corporation, Appellant (Defendant),

The City of Sheridan, Wyoming, a Municipal Corporation (Defendant),

v.

William H. PHILLIPS and Cynthia Phillips, Appellees (Plaintiffs).

No. 5468

William H. PHILLIPS and Cynthia Phillips, Appellants (Plaintiffs),

v.

ABC BUILDERS, INC., a Corporation, and The City of Sheridan, Wyoming, a Municipal Corporation, Appellees (Defendants).

No. 5469

The CITY OF SHERIDAN, Wyoming, a Municipal Corporation, Appellant (Defendant),

Abc Builders, Inc., a Corporation (Defendant),

v.

William H. PHILLIPS and Cynthia Phillips, Appellees (Plaintiffs).

No. 5470

ABC BUILDERS, INC., a Corporation, Appellant (Defendant and Third-Party Plaintiff),

v.

Kenneth R. KASTER and Virginia R. Kaster, husband and wife, Appellees (Third-Party Defendants).

The CITY OF SHERIDAN, Wyoming, a Municipal Corporation, Gary N. Benson and Betty Ann Benson, husband and wife (Third-Party Defendants),

v.

William H. PHILLIPS and Cynthia Phillips (Plaintiffs).

No. 5484

Nos. 5468–5470 and 5484.

Supreme Court of Wyoming.

Aug. 13, 1981.

Stuart S. Healy, Kennedy, Connor & Healy, Sheridan, signed the briefs and appeared in oral argument on behalf of ABC Builders, Inc.

Harry F. Schwartz, Sheridan, signed the brief and appeared in oral argument on behalf of the City of Sheridan.

George S. Andrews, Andrews, Andrews & Riske, P.C., Cheyenne, signed the brief on behalf of amici curiae, the Sheridan County

Board of Realtors and the Wyoming Board of Realtors, in support of the position of ABC Builders, Inc.

Micheal K. Shoumaker, Badley, Rasmussen & Shoumaker, Sheridan, signed the briefs and appeared in oral argument on behalf of the Phillipses.

Jeffrey J. Gonda, Sheridan, signed the brief on behalf of the Kasters.

Before ROSE, C. J., and RAPER, THOMAS, ROONEY and BROWN, JJ.

RAPER, Justice.

The liability of vendors of new and used residential property for damages arising out of the dangers of building site location will be the primary subject of this opinion. These appeals arise from a jury verdict holding a developer-builder-vendor and a city negligent and thus liable for damage to a house resulting from a landslide. We will address four major issues: 1) the effect of the district court's dismissal of an intermediate owner whose conduct may have contributed to the damages, between the builder-vendor and ultimate owner damaged by the landslide; 2) whether a builder-vendor can be liable by reason of negligence in selecting the site upon which to build a home for sale; 3) from what point in time the statute of limitations starts to run when a suit is maintained based upon negligent site selection; and 4) if sufficient evidence was presented to establish municipal liability for contribution to the ultimate loss to the final owner because of a failure to maintain a drainage ditch.

We will affirm.

I

This case concerns the rise and fall of a house located in Sheridan. On November 14, 1968, ABC Builders, Inc. (ABC) obtained from the City of Sheridan (City) a building permit for the construction of a residence at 40 Kelly Drive in a subdivision known as Sheltered Acres. The particular lot picked for the new home was situated at the toe of a hillside. Some excavation work was necessary to fit the two-story house into the hill. The final result was a residence with the front of the first floor facing east at street level, while at the back of the house the same floor was subterranean.

On August 24, 1969, the house was sold by ABC to Kenneth and Virginia Kaster (Kasters). During the time the Kasters owned the home, they added a patio to the rear of the second floor which was all above ground. This addition included a roof and an attached storage shed. The earth taken to level the ground for the patio was used in leveling out the south side of the lot so that a driveway could be installed. Mr. Kaster also added a four-inch perforated drain pipe from a downspout off the patio roof which drained into an adjacent lot which the Kasters had also purchased from ABC. We will later discuss this drain as it relates to the liability of the vendor in the sale of a used residence.

In August of 1971 the Kasters conveyed the property to Gary and Betty Benson (Bensons).[1] The Bensons made no alterations to the structure. They sold and transferred the home to William and Cynthia Phillips (appellees), in June, 1977. Up until May, 1978, the only complaint voiced about the house was that during the last year that the Bensons owned it, there was some minor seepage of water from the back wall of the first floor identified as being caused by a defective sump pump. At the time of sale by the Bensons to appellees, the Bensons replaced water-stained carpet which had resulted; but then in May of 1978 heavy rains began falling.

The National Weather Service office at the Sheridan County airport officially recorded 6.80 inches of rain for the month of

1. The Bensons are not parties to this appeal. Summary judgment was granted in their favor and counsel for ABC indicated at the time of its granting that summary judgment for the Bensons was not a concern, apparently because they had been joined in the first place under the mistaken belief that they had added the patio and downspout which ABC asserted contributed to ground instability resulting in a landslide which will be thoroughly discussed in this opinion.

May, 1978. This was 4.35 inches above the average amount of rain for the month. The daily breakdown shows that most of the rain fell during two wet spells. The first one began May 3 and lasted through May 11. With almost daily rainfall, 2.23 inches of precipitation was recorded during that period. The rain then abated until May 16, when during the ensuing four-day period, another 3.78 inches of rain was recorded.

The appellees first observed water leaking into the first-floor bathroom on May 7. The next day, some slight displacement of the home's foundation was noticed. With the rain continuing to fall, the Phillipses left the home on May 9 when they realized the hillside behind them was sliding down and pushing against the house. However, Mr. Phillips returned the next week during the short respite between the rainy periods. Efforts were made to save the residence by digging trenches around its foundation. But, this proved useless with the return to wet weather on May 16. All that the Phillipses could do was to find a house mover who saved the top floor, subsequently moved elsewhere and used in the construction of a new residence.

The following illustration may clarify how the slippage of the hillside destroyed the house:

On September 19, 1979, the appellees as plaintiffs filed an action against ABC on both warranty and negligence theories. When the district court dismissed the case claiming the statute of limitations had run, the Phillipses appealed. In that appeal this court reversed and remanded, holding the then applicable statute of limitations unconstitutional. *Phillips v. ABC Builders, Inc.*, Wyo., 611 P.2d 821 (1980).

Back in district court, ABC impleaded the City, the Kasters, and the Bensons. However, the district court, before trial, granted the Kasters and the Bensons summary judgments and dismissed them from the case. As we reach the issues related to these developments, we will set out other pertinent facts.

The case proceeded to trial on September 18, 1980. It was submitted to the jury only on the negligence claim. On the verdict form the jury was allowed to apportion negligence among ABC, the City of Sheridan, the appellees, and the Kasters. It divided up the negligence:

| "ABC Builders, Inc., | 80 | % |
| "City of Sheridan | 15 | % |

| | | |
|---|---|---|
| "William H. Phillips and Cynthia Phillips | 5 | % |
| "Kenneth Kaster and Virginia R. Kaster | 0 | % |
| | 100 | %" |

The jury further found that the appellees had sustained damages totaling $40,000. Accordingly, judgment was entered and the various appeals here involved ensued.

## II

The first issue we consider concerns the district court's dismissal of the Kasters from the case. The Kasters moved for summary judgment based on the pleadings and depositions taken. ABC filed a responsive affidavit of one of its principal owners setting out generally that at the time the home was built, the ground was stable and the lot contoured for proper drainage. He observed the removal of soil, the addition of a patio, and roof drainage into the ground. He also observed above the home, about 200 feet west, a ditch built and maintained by the City which was clogged by roofing paper, milk cartons, cement sacks, weeds, sticks and other debris, causing the water to accumulate above the appellees' property. The affidavit of a licensed engineer was also furnished by ABC which concluded that the ground failure which caused the collapse of appellees' home was created by the City's drainage ditch and by the Kasters adding more water to the soil by the drainage from the west roof of the house and patio into the ground through a drain pipe which received the water from a downspout added as a part of the patio.

Mr. Kaster's deposition was to the effect that while there was an escarpment [2] upon the hill, it gave him no concern. He was content with the soundness of the house itself and never noticed it had any structural problems, never had any water leakage into the lower section nor any cracking or displacement of the foundation. Before putting in the patio and drainage tile, there was a low spot at the rear of his lot in which water would accumulate. He was very much satisfied with the house and never had any water or other problems. The Kasters sold the house to the Bensons, unaware of any difficulties about which a warning should issue to the Bensons.

At the close of the hearing on the motions for summary judgments, the trial judge granted summary judgment in favor of the Kasters, with the following comments:

"Now, in regard to the summary judgment filed on behalf of the Kasters. I think there are a lot of interesting points and questions; and certainly Mr. Healy has done a good job in presenting his viewpoint of why they should remain in this suit, but the Court is unable to come up with any theory of liability on their part to any of the parties here under the existing law. Further, the Court doesn't see where the defenses of ABC Builders will be changed or harmed in any way by removing the Kasters. If this is to be submitted—the negligence question part of the case—submitted on comparative negligence, why, there is no necessity of

2. A long cliff or steep slope separating two comparatively level or more gently sloping surfaces and resulting from erosion or faulting. Webster. This definition fits photos of the area above the residence.

the parties being there to have the jury assign them any percentage of negligence for building this portion; so the Court doesn't see how ABC Builders can be hurt in this matter. The Court doesn't see where there was any duty on the Kasters in the suit as it now stands as a matter of law, so the Court is going to grant that motion for summary judgment also. I will ask both of the successful counsel in these motions to prepare the proper order and to submit it to Mr. Healy for his perusal and okay as to form."[3]

While the trial judge announced that the Kasters had no duty to anyone as a matter of law under the undisputed facts before him, the form of summary judgment presented to him and which he signed appears to be carelessly drawn and stated only that it was granted because, "there exists no material issue of fact regarding the claim of the Third-Party Plaintiff against Third-Party Defendants, Mr. and Mrs. Kaster." A proper form of summary judgment must rest on a dual finding that there was no genuine issue as to any material fact and that the prevailing party was entitled to judgment as a matter of law. *Meuse-Rhine-Ijssel Cattle Breeders of Canada Ltd. v. Y-Tex Corp.*, Wyo., 590 P.2d 1306 (1979). We have the same duty as the trial judge and consider motions for summary judgments as though originally presented to us. *Weaver v. Blue Cross-Blue Shield*, Wyo., 609 P.2d 984 (1980). We may, therefore, and do correct the shortcomings of the order as to entitlement as a matter of law.

It would appear that at the time of granting the summary judgment the Kasters did not resist the position of ABC that their installation of the patio and drainage system contributed to the landslide, though from the evidence developed by deposition and at trial the heavy rains and accumulation of water in the City's drainage ditch were the principal factors causing the ground to give way. Some of the expert testimony at the trial was to the effect that the downspout and drain pipe had no effect at all on the catastrophe.

The trial judge was correct in granting summary judgment for the Kasters. The Kasters cannot be charged with negligence for a condition to which they were not alerted by knowledge or warning even if some act on their part may have contributed to the failure of the ground underlying the house in question. As said by Prosser, Law of Torts (4th Ed.1971) § 30, p. 143, a cause of action founded upon negligence from which liability will follow is based upon a traditional formula:

"1. *A duty, or obligation, recognized by the law, requiring the actor to conform to a certain standard of conduct, for the protection of others against unreasonable risks.*

"2. A failure on his part to conform to the standard required. These two elements go to make up what the courts usually have called negligence; but the term quite frequently is applied to the second alone. Thus it may be said that the defendant was negligent, but is not liable because he was under no duty to the plaintiff not to be.

"3. A reasonable close causal connection between the conduct and the resulting injury. This is what is commonly known as 'legal cause,' or 'proximate cause.'

---

**3.** The court made further pertinent rulings in this regard:

"THE COURT: I may have said that, Mr. Healy. I really didn't mean all that. I don't feel that there's any liability in the Kasters in this suit at this time. I don't feel that it's been shown to the Court that they had any duty not to have built a patio or to have built it differently, etc. Now, you may prove at the trial that the reason the house collapsed—for lack of a better word—was because this patio was built and all that sort of thing; but I don't think that makes them liable to anyone as this case now stands, but it certainly would have a bearing on your client as to whether or not there was a violation of the implied warranty or whether or not they were negligent in causation, etc. I'm sure that can be litigated in this case as far as your client is concerned.

 * * * * * *

"THE COURT: No. I think as far as contribution is concerned, I'm apparently ruling that way. As the case now stands, I don't think there is any right of contribution of the Kasters to ABC Builders."

"4. Actual loss or damage resulting to the interests of another. Since the action for negligence developed chiefly out of the old form of action on the case, it retained the rule of that action, that proof of damage was an essential part of the plaintiff's case. Nominal damages, to vindicate a technical right, cannot be recovered in a negligence action, where no actual loss has occurred. The threat of future harm, not yet realized, is not enough. Negligent conduct in itself is not such an interference with the interests of the world at large that there is any right to complain of it, or to be free from it, except in the case of some individual whose interests have suffered." (Footnotes omitted and emphasis added.)

Summarized, the essentials of negligence are a duty on the part of a defendant and a failure to perform the duty which proximately caused damage to the plaintiff. *Danculovich v. Brown*, Wyo., 593 P.2d 187 (1979).

We are concerned with number one of Prosser's summary. Did the Kasters, as intermediate owners, have any duty to conform to any standard of conduct toward future purchasers of the residence; and, if so, what was that standard? We have, in *Tavares v. Horstman*, Wyo., 542 P.2d 1275 (1975), and *Moxley v. Laramie Builders, Inc.*, Wyo., 600 P.2d 733 (1979), held developers-builders-vendors responsible to purchasers of a residence on the basis of an implied warranty and concluded that the buyer could rely on negligence of the builder for recourse as well. The reasons for such a rule rest in the fact that such a builder is in a *position of superior knowledge*; building is his business. Much of what he does is concealed from sight, *not* discoverable by inspection. And, as a matter of public policy the builder should not be relieved of liability under the concept that it is more equitable to assess the builder[4] for losses attributable to latent defects which he has created. In *Tavares* this court also held that the buyer should not be charged with negligence as contributory negligence for building a barn over part of a septic tank drain field when not alerted by proper warning, citing *Brubaker v. Glenrock Lodge International Order of Odd Fellows*, Wyo., 526 P.2d 52 (1974).

■ It can hardly be expected that the Kasters were any more than the usual home buyers in the same position as the appellees. It was reasonable for them to do as many buyers of new homes do, add on and improve. Here all they did was improve with construction of a patio with storage shed which to all appearances is an innocent act in the absence of some knowledge which removes it from that category. Professional developers and builders as vendors are in a different posture and, upon sale, subject to different duties. The record of the sum-

---

4. This justifying reason in support of a rule binding land developers and builders is excellently summarized in 25 A.L.R.3d § 2, 383, 391, where it is said:

"* * * [T]he decided trend of modern decisions is to make a distinction with respect to a vendor who is also the builder of a new structure, and that where the vendor is also the builder, he is today, by the weight of modern authority, held liable for damages and injuries occurring after the surrender of title and possession, on one or more of three theories: (1) implied warranty; (2) an imminently dangerous condition caused by negligence in construction; and (3) concealing or failing to disclose to his vendee any condition which involves unreasonable risk to persons on the land if the vendee does not know or have reason to know the condition of the risk involved and the vendor knows or has reason to know of the condition, realizes or should realize the risk involved, and has reason to believe that the vendee will not discover the condition or realize the risk. Restatement, Torts 2d § 353.

"Similarly, it has been said that the trend of recent judicial decisions is to invoke the doctrine of implied warranty of fitness in cases involving sale of new houses by the builder; that the old rule of caveat emptor does not satisfy the demands of justice in such cases; that the purchase of a home is not an everyday transaction for the average family, and in many instances is the most important transaction of a lifetime; and that to apply the rule of caveat emptor to an inexperienced buyer, and in favor of a builder who is daily engaged in the business of building and selling houses, is manifestly a denial of justice." (Footnotes omitted.)

See also 6A Powell on Real Property (1980) § 938.1, et seq.

mary judgment proceedings, including materials considered and even the trial transcript, fails to disclose that the Kasters knew or should have known, as prudent homeowners, that lurking above their home was an unstable slope, liable to move down and buckle the land under them if they should drain water into the ground from a patio they had built, and endanger the stability of their home and cause damage to any future buyer of the premises. In private sales between vendor, not a builder-vendor, and a vendee, ordinarily the vendor has no greater skill in determining quality than has the vendee and they are in an equal bargaining position. *Waggoner v. Midwestern Development, Inc., infra.*

On the other hand the record has considerable evidence in it to show that appellants ABC Builders and City of Sheridan had extensive knowledge or should have known of the unstable ground above the residence. In 1963, a testing laboratory did core drilling and the engineer for the City studied the area in connection with the request of ABC Builders to open a street about 200 feet above the lot in question. A further similar study was done in 1968. Their findings resulted in the conclusion that it was not feasible to open the street because of an instability of the ground on the hillside which would have necessitated construction of a retaining wall. It was concluded that the whole area in the vicinity of the street upon which the house in question backed up to had actual problems of instability. The record is clear that the appellant had full knowledge of those problems before building in the area because the studies resulted from his persuasion. Appellant had water problems with building in the vicinity and was advised through engineering counsel to install drain tiles around houses to carry off water accumulating in the building sites. From the evidence in the record, not only pertaining to the summary judgment but also at trial, the Kasters did not have, nor can it reasonably be expected under the circumstances disclosed that they had, this same knowledge.

This court has recently said that the matter of whether a duty of care exists is a question of law to be determined by the court. *Medlock v. Van Wagner*, Wyo., 625 P.2d 207 (1981). This appeal gives us a vehicle to determine and announce the duty and standards of responsibility of owners other than the original builder-vendor for damage which occurs, such as in this case where the appellant builder sold to the Kasters, then the Bensons who sold to appellees who ultimately suffered.

While the law implies an obligation on the part of a vendor to convey a marketable title, yet with respect to the physical condition of the premises the traditional view had been that the rule of caveat emptor (let the buyer beware) applies except, because of modern developments in the law with respect to new housing built for sale and failure to disclose defects. 77 Am.Jur.2d, Vendor and Purchaser §§ 329–336, pp. 492–496. This court has observed that the harsh rule of caveat emptor has undergone some softening and has never been literally applied in this jurisdiction. *Tavares v. Horstman, supra.* It appears to us that § 353 of the Restatement, Torts 2d sets a fair rule of duty applicable to the homeowner upon resale:

"(1) A vendor of land who conceals or fails to disclose to his vendee any condition, whether natural or artificial, which involves unreasonable risk to persons on the land, is subject to liability to the vendee and others upon the land with the consent of the vendee or his subvendee for physical harm caused by the condition after the vendee has taken possession, if

"(a) the vendee does not know or *have reason to know* of the condition or the risk involved, and

"(b) the vendor knows or *has reason to know* of the condition, and realizes or should realize the risk involved, and has *reason to believe* that the vendee will not discover the condition or realize the risk.

"(2) If the vendor actively conceals the condition, the liability stated in Subsection (1) continues until the vendee discovers it and has reasonable opportunity to take effective precautions against it.

Otherwise the liability continues only until the vendee has had reasonable opportunity to discover the condition and to take such precautions." (Emphasis added.) [5]

It can be seen from the comments of the trial judge at the time he ruled for the Kasters on the motion for summary judgment, that he sensed but would not or could not express this as the rule; and upon the basis of the information before him on the motion for summary judgment, he properly held there was no duty resting with them toward the appellees, their buyers, nor to ABC Builders. There is no showing in the summary judgment materials or even in the trial proceedings that the Kasters concealed or failed to disclose to the Bensons a condition of which they knew or had reason to know which constituted an unreasonable risk underlying the land or from the patio drain to the Bensons and the appellees as the subvendees.[6] Nor was there any reason shown that the vendees, the Bensons, knew or had reason to know of any condition or unreasonable risk. As noted, ABC did not and does not now contest granting of summary judgment to the Bensons.

In the application of § 353 of the Restatement, supra, we can find no violation of a duty by the Kasters to the appellees. They, therefore, were not actors whose names should ever have appeared on the verdict form. All the vendees were innocent purchasers and when the Kasters and Bensons sold, they were innocent vendors. As an aside, we note that the appellees never did assert that they had any claim against the Kasters.

■ The Kasters having no duty to the appellees, had no liability to share appellees' loss with ABC. ABC's claim against the Kasters is for contribution. The language of § 1–1–110(a), W.S.1977, speaks for itself in that regard and clearly excludes the Kasters:

"(a) Except as otherwise provided in W.S. 1–1–110 through 1–1–113, where two (2) or more persons *become jointly or severally liable in tort for the same injury to person or property* or for the same wrongful death, there is a right of contribution among them even though judgment has not been recovered against all or any of them." [7]

5. The Restatement, Torts 2d contains and we adopt the following definitions pertinent not only to this rule but as otherwise used in this opinion:

"§ 3. Actor
"The word 'actor' is used throughout the Restatement of this Subject to designate either the person whose conduct is in question as subjecting him to liability toward another, or as precluding him from recovering against another whose tortious conduct is a legal cause of the actor's injury.

"§ 4. Duty
"The word 'duty' is used throughout the Restatement of this Subject to denote the fact that the actor is required to conduct himself in a particular manner at the risk that if he does not do so he becomes subject to liability to another to whom the duty is owed for any injury sustained by such other, of which that actor's conduct is a legal cause.

\* \* \* \* \* \*

"§ 11. Reasonably Believes
"The words 'reasonably believes' are use throughout the Restatement of this Subject to denote the fact that the actor believes that a given fact or combination of facts exists, and that the circumstances which he knows, or should know, are such as to cause a reasonable man so to believe.

"§ 12. Reason to Know; Should Know
"(1) The words 'reason to know' are used throughout the Restatement of this Subject to denote the fact that the actor has information from which a person of reasonable intelligence or of the superior intelligence of the actor would infer that the fact in question exists, or that such person would govern his conduct upon the assumption that such fact exists.
"(2) The words 'should know' are used throughout the Restatement of this Subject to denote the fact that a person of reasonable prudence and intelligence or of the superior intelligence of the actor would ascertain the fact in question in the performance of his duty to another, or would govern his conduct upon the assumption that such fact exists."

6. A subvendee is one to whom a vendee sells. Restatement, Torts 2d, § 353, Comment (a), page 236.

7. This section is derived from § 1 [1–7.3(d)], Chapter 67, Session Laws of Wyoming, 1973, before the legislature tinkered with the Uniform Contribution Act in its revision, § 1 [1–1–110], Chapter 188, Session Laws of Wyoming, 1977. It originally read:

The Kasters are not tortfeasors. A tortfeasor is a wrongdoer; one who commits or is guilty of a tort. Black's Law Dictionary, Fifth Edition, 1979. Generally speaking, and without attempting an all-inclusive definition, a tort has a meaning similar to wrong and is an unlawful act injurious to another, independent of contract. *Price v. State Highway Commission*, 62 Wyo. 385, 396, 167 P.2d 309, 312 (1946). Not being tortfeasors, the Kasters had no liability either jointly or severally to the appellees for injury to appellees' property and therefore had no liability to ABC for contribution, even though they may have unconsciously created a condition which may have contributed to appellees' loss.

Since the Kasters were not negligent as properly determined by the summary judgment, their names should never have been on the verdict form as actors [8] in appellees' loss. No liability can be grounded on negligence if no duty exists on the part of an individual. *Maxted v. Pacific Car & Foundry Co.*, Wyo., 527 P.2d 832 (1974); *Guinand v. Atlantic Richfield Company*, 485 F.2d 414 (10th Cir. 1973). Once it has been determined that a person has no liability in connection with the occurrence, no reason remains for that person's name to appear on the verdict form for a determination of a percentage of negligence.[9]

Since it was error for the district judge to include the Kasters on the verdict form, does that constitute such error that we must reverse and send the case back for a new trial or was the error harmless? Rule 7.04, W.R.A.P., declares that "[a]ny error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." While it was not a function of the jury to make any determination of law, by its finding of zero negligence as to the Kasters it arrived at a finding which caused the ultimate outcome of the case in the court's final judgment on the verdict to be correct. The result was the same as though the Kasters had not been included on the verdict form. The adoption of Rule 7.04, W.R.A.P., taken from Rule 49, W.R.Cr.P., and Rule 61, W.R.C.P., is procedural and it did not alter or diminish the substantive law of Wyoming as it previously existed and is merely declaratory of old principles of law. *Hays v. State*, Wyo., 522 P.2d 1004 (1974); *Robertson v. State Highway Commission*, Wyo., 450 P.2d 1003 (1969).

An error to warrant reversal must be prejudicial and affect the substantial rights of an appellant. *Tompkins v. Byrtus*,

---

"(d) As used in sections 1–7.4 through 1–7.7 of the statutes, 'joint tortfeasor' means one of two or more persons jointly or severally liable in tort for the same injury to person or property, whether or not judgment has been recovered against all or some of them."
The legislature should ordinarily not change the language and format of uniform acts unless some substantive change is desired and intended. It deprives users of and threatens the benefit of authorities available from other jurisdictions and text sources and even any pre-revision interpretations this court has made. This particular change appears to have been unnecessary and, while not serious, it required additional search and definition.

**8.** See definition of actor, footnote 5, this opinion.

**9.** This statement is not intended to include the person who *has* settled with a plaintiff, as in *Board of County Commissioners of County of Campbell v. Ridenour*, Wyo., 623 P.2d 1174, 1192, fn. 14, where it was stated as a matter of public policy that:

"All of the participants to the transaction should be joined in the action. This will encourage judicial economy because otherwise the result reached in the case may not be given collateral estoppel effect and therefore a second action might be necessary. * * *"

The designation "participants" as above and on p. 1188 of *Ridenour* is not well used; it should have been "actors" which has a special meaning in the law of torts as we have herein adopted the definition as set out in Restatement, Torts 2d, supra, fn. 5 of this opinion. *Ridenour* was decided February 3, 1981. The trial of the case before us now was held starting September 18, 1980, so the use of the word "participants" in that case should not have misled the trial judge.

See also, *Beard v. Brown*, Wyo., 616 P.2d 726 (1980) where, in an appropriate case, an employer's percentage of negligence should be included though the employer is covered by worker's compensation.

72 Wyo. 537, 267 P.2d 753 (1954); *Day v. Smith*, 46 Wyo. 515, 30 P.2d 786 (1934); *Stockgrowers' Bank of Wheatland v. Gray*, 24 Wyo. 18, 154 P. 593 (1916). Where no injury resulted to an appellant, errors will be overlooked by this court, *Jenkins v. City of Cheyenne*, 1 Wyo. 289 (1876). While the prevailing rule in criminal cases, the test can be reasonably applied in civil cases as well, that for an error to be harmful, there must be a reasonable possibility that in the absence of error the verdict might have been more favorable to a defendant. *Hoskins v. State*, Wyo., 552 P.2d 342 (1976), reh. denied 553 P.2d 1390, cert. denied 430 U.S. 956, 97 S.Ct. 1602, 51 L.Ed.2d 806. If the determination of a trial court is correct on any theory, it will not be disturbed. *White v. Wheatland Irrigation District*, Wyo., 413 P.2d 252 (1966).

We cannot visualize how the outcome of this case could have been any different with the jury's verdict as it was. It would have been another story, however, if the jury had decided that for example, the Kasters had been 10% negligent. In that event, one or the other of the appellants, ABC or the City, or appellees may have been prejudiced because it would become speculative as to whom the 10% would then be assigned. As the case now stands, with the Kasters being nonactors with no possible liability, the outcome is the same as though their names had not been on the verdict form.

## III

The next issue for consideration is whether there is a duty upon ABC as a builder-vendor of homes to select a safe site for such construction. There is no question involved in this appeal that appellees are not the original buyers. If a builder's liability exists, it may exist for subsequent purchasers. *Moxley v. Laramie Builders, Inc.*, supra, settled that issue. The claim of the appellees was presented to the jury as a negligence case. In *Tavares v. Horstman*,

supra, this court did not reach the question of unsafe building sites but discussed only the duty of builders-vendors to provide a habitation free from negligent design and construction. Though we also held that the sale of a new house by a builder of homes carries with it an implied warranty that it is constructed in a reasonably workmanlike manner and fit for habitation, this court approved seeking damages upon the basis of either breach of implied warranty or negligence. Providing a safe site goes like hand and glove with construction. There is nothing unusual about liability in the builder-vendor for selling a home built on a site negligently selected and it develops that danger surfaces and causes damage to an unwary buyer. It is a question which has caught the attention of courts and text writers.[10] Courts have gone off in different directions in reaching liability for damages arising out of unsafe building sites, including implied warranty, fraud and deceit, and negligence.

In *Waggoner v. Midwestern Development, Inc.*, 83 S.D. 57, 154 N.W.2d 803 (1967), it was held that builders-vendors could be held liable irrespective of fault on the basis that where one holds himself out as qualified to perform work of a particular character, there is an implied warranty that a completed structure would be reasonably fit for the intended purpose. In that case there were also heavy rains in May and June, the water table rose and water seeped into the basement causing cracks which permitted infiltration of water into the structure.

In *Rutledge v. Dodenhoff*, 254 S.C. 407, 175 S.E.2d 792 (1970), placement of a septic tank system in the presence of a high water table was a factor which caused it to overflow and back up into homes, particularly during wet weather. The case was decided on the basis of implied warranty, and it was held that the builder was liable. It was held that purchaser and builder are not on equal footing and the purchaser is at the

---

10. An excellent discussion of the dangers of property location appears in 12 Am.Jur., Proof of Facts, Second (12 POF2d) p. 103, et seq.

mercy of the builder-vendor. In *Bethlahmy v. Bechtel*, 91 Idaho 55, 415 P.2d 698 (1966), the builder placed tile pipe in and covered up an irrigation ditch and built a garage over the top. During irrigation season, water came through the concrete floor and seeped into the basement. After complaint, the builder rerouted the ditch around the lot through a sealed tile pipe but the water problem continued due to a high water table in the vicinity created by the irrigation ditch. The court there went so far as to hold there was liability for fraudulent concealment. The defendant was held to have dealt from a position of superior knowledge and not at arms length.

Nevada also adheres to the rule that a builder may be held liable for sale of an unsafe building site. In *Village Development Co. v. Filice*, 90 Nev. 305, 526 P.2d 83 (1974), the court held that the developers with superior knowledge had failed to warn the buyers of the lot in the Lake Tahoe basin of the risks associated with it being in the flood plain of a mountain stream, though they knew the buyers planned to build. They were thus liable in negligence when the home that was built was destroyed by a flow of water carrying mud, trees and other debris. It is interesting to note that this court utilized § 353, Restatement, Torts 2d, supra, to hold the vendor liable, because of its knowledge of the risks involved where the vendee would not discover the condition or realize the risk.

In *Sabella v. Wisler*, 59 Cal.2d 21, 27 Cal.Rptr. 689, 377 P.2d 889 (1963), an old quarry pit was used over the years for dumping of trimmings and cuttings and similar waste matter. The owner contracted to have it filled, covering over the waste with earth. The fill material and dirt were dumped onto the land without being specifically compacted. It did not look like filled land. The defendant, an experienced home builder, purchased the property but never attempted to inform himself of the nature, composition or quality of the earth underneath the leaves he saw there. It was found that inquiry and soil tests would have disclosed that the ground was unfit for a building site. The house built was not specially built for anyone in particular but for sale. There were heavy rains during the early winter sufficient to cause a large quantity of earth and rock to break away from the cliff behind the house and slide into the plaintiff's back yard and patio. Later, subsidence of the filled land occurred causing the house to sink at many places, one part to drop over seven inches and the house to break away from the sewer pipe permitting the sewage to accumulate in the ground around the home. The defendant was held negligent in constructing the dwelling upon an improperly compacted lot.

Another pertinent California case is of interest. In *Conolley v. Bull*, 258 Cal. App.2d 183, 65 Cal.Rptr. 689 (1968), the defendant, a real estate speculator, built a sale house on sloping ground. The owner of adjoining property advised him that it was a slide area because one had occurred on his property some time earlier and furnished him with an engineer's report indicating that underground movement of subsurface water caused slides to occur in that area. The house was sold to plaintiff. Later during a night while it was raining, a landslide occurred behind the property and the house was almost lost. The court affirmed the trial court and held the developer accountable in a negligence action for failure to carefully investigate the condition of soil before building on hillside lots.

The land involved in *Westwood Development Company v. Esponge*, Tex.Civ.App., 342 S.W.2d 623 (1961), had been used as a sanitary landfill and garbage dump. Thereafter, the tract upon which it was located was subdivided and development homes built by defendant, as a developer, with one being sold to the plaintiff. A heavy rain fell on the area causing the lots, including plaintiff's over the sanitary fill to settle considerably. The court found defendant negligent (and also guilty of statutory fraud) and liable for damages.

As was appropriately said by the court in *House v. Thornton*, 76 Wash.2d 428, 457 P.2d 199 (1969), in connection with the slippage of sloping ground upon which a house

had been built by the defendant speculator, following heavy rains:

"Nothing, of course, can be said to be more vital to a dwelling than the stability of its foundation. When the foundation of a house cracks, slips, shifts or deteriorates to such an extent that a person of reasonable prudence would reasonably assume that the house is unsafe for occupancy, it is no longer fit for its intended purpose, i. e., a place of residence for the owner and his family. This, of course, is true whether the danger arises from instability of the land and terrain on which the foundation rests or from defects in the foundation's design, installation, fabrication or composition. There can be little doubt that the house which plaintiffs bought from the defendants met this test of unsuitability. The evidence amply supported the court's conclusion that the sliding, slipping, and cracking of the foundation and floors, and the cracking and shifting of the walls, although due not to faulty design, installation or workmanship but rather to the instability of the ground and terrain upon which the house stood, rendered the premises unusable as a dwelling." 457 P.2d at 203. The builder was held liable.

It appears from the foregoing that there are two different directions to go in pursuing a developer-builder of new homes for sale by reason of his selection and transfer of a dangerous building site: Implied warranty and negligence including § 353 of the Restatement, Torts 2d, supra. The appellees have here cross-appealed, but on a conditional basis to be considered only in the event we should reverse. They argue strenuously that their claim against ABC should have been presented to the jury on the basis of implied contract and were entitled to a directed verdict as to liability once it was established that the building site was unstable. We need not consider that issue in that the trial judge elected to present the case to the jury on the basis of negligence, which appellees had also claimed by various approved amendments to their complaint against ABC and the City of Sheridan. It would be our observation that the trial judge was probably concerned about mixing up in the action, breach of contract and negligence in the light of the potential liability of the City of Sheridan for negligence, his view that the Kasters should be on the verdict form in determining comparative negligence and the eventual possibility of a contribution problem. There is a good question as to whether and how it is possible to determine comparative fault between two parties when one is guilty of breach of contract and another is guilty of negligence. We will not attempt to tackle that issue in this case, in that the negligence approach became the law of the case by virtue of the court's instructions, all grounded on negligence. *Matter of Estate of Mora*, Wyo., 611 P.2d 842, 846 (1980); *Cox v. Vernieuw*, Wyo., 604 P.2d 1353 (1980); *Gary v. Foster Lumber Company, Inc.*, Wyo., 531 P.2d 497 (1975); *DeWitty v. Decker*, Wyo., 383 P.2d 734 (1963), and our decision to affirm.

Negligence involves a recognizable danger which is apparent or should be apparent to one in the position of the actor. *Endresen v. Allen*, Wyo., 574 P.2d 1219, 1221 (1978). In that case, this court recognized the duty of an actor in that position by approval of language from 57 Am. Jur.2d, Negligence § 58, pp. 408–409:

"The probability of injury by one to the legally protected interests of another is the basis for the law's creation of a duty to avoid such injury, and foresight of harm lies at the foundation of the duty to use care and therefore of negligence. The broad test of negligence is what a reasonably prudent person would foresee and would do in the light of this foresight under the circumstances. Negligence is clearly relative in reference to the knowledge of the risk of injury to be apprehended. * * * The most common test of negligence, therefore, is whether the consequences of the alleged wrongful act were reasonably to be foreseen as injurious to others coming within the range of such acts."

We hold this to be the duty of ABC as builders to appellees: To furnish a safe location for a residential structure and it may be negligence to not do so.

ABC raises a question about the sufficiency of the evidence. We hold further that the record supports the jury's verdict. There is evidence that ABC was an experienced builder and in possession of extensive knowledge about the location and that it should have known of the apparent dangers of the hillside as a building site, some of which we have already related. Therefore, we must uphold the jury's determination that ABC was liable to appellees for their loss since we take those parts of the evidence most favorable to successful parties and leave out of consideration the evidence of the unsuccessful party in arriving at this conclusion. *Tavares v. Horstman,* supra.

Specifically the record reflects that ABC began development of the Sheltered Acres subdivision, Sheridan, adjacent to the appellees' house, in 1962. The firm as builders constructed approximately 130 homes in that area and several hundred around Sheridan prior to construction of the house over which we are concerned. ABC Builders owned lots on both sides of a proposed Main Street extension which appellees' lot joined on the east. ABC urged the City to open up the street for better access into Sheltered Acres. As a result a study was done in 1963 and another in 1968, of which ABC had knowledge. The first was a geological study by Northern Testing Laboratory and involved core drilling throughout the area. One test hole was directly west of appellees' property about 200 feet distant. The studies and conclusions disclosed that the ground was unstable, all of which information was available to ABC. Actual subsidence which could be observed had occurred west of the property in 1954 and which should have alerted a skilled builder to further investigation and care. The president of ABC called the city engineer about a water problem in building on the west side of the proposed extension near

the appellees' location and was advised to install drainage tile.

The geological study reflected what we have previously set out as a profile of the underground structure. It is stable when dry but when water penetrates to the hard clay surface, it becomes slippery and the weight of wet surface ground on the 21% grade (which is a fairly steep grade) causes it to slide because of the slip plane. It was the opinion of all experts testifying that the site was not safe for building and that a prudent builder would make a site investigation before building and the reasonable inference is that such an investigation would disclose the dangers of the area. The reasonable inferences to be drawn from the testimony on the subject is that the site was unsafe and that it should have been apparent to ABC.

ABC urges that the cause of the loss was not within the lot itself but from conditions existing in another area, not its property. The house was built in the path of an earth slide liable to occur at any time. Subsidence had occurred before and with proper addition of rain and accumulated water would occur again and, from the evidence pointing that way, should have been apparent to ABC. A builder has a responsibility to furnish a safe site whether damage is likely to arise within the confines of the lot boundaries or from forces originating beyond its limits. See *Town Council of Town of Hudson v. Ladd,* infra, where forces causing damage to plaintiff did not take place on his land and recovery was allowed. See also the cases we have heretofore cited where damages occurred from outside forces and not from within the lot itself.

## IV

The third issue we consider concerns the statute of limitations. ABC, after acknowledging that this court struck down the special ten-year statute of limitation for improvements to real property in *Phillips v. ABC Builders, Inc.,* supra, argues that the four-year statute of limitation for tort ac-

tions found in § 1–3–105, W.S.1977,[11] operates to bar the appellees' claim. This argument is premised upon the correctness of ABC's notion that the cause of action accrues "with the selection of the building site."

It was noted in *Duke v. Housen*, Wyo., 589 P.2d 334, 340 (1979), that the statute of limitations does not begin to run against a negligence action until some damage has occurred, quoting from Prosser, Torts (4th Ed. 1971) § 30, pp. 143–144. The court further noted, 589 P.2d at 343, the following passage to be a correct summarization of the law:

"* * * As a general rule, where an injury, although slight, is sustained in consequence of the wrongful act of another, and the law affords a remedy therefor, the statute of limitations attaches at once. It is not required that all the damages resulting from the act shall have been sustained at that time, and the running of the statute is not postponed by the fact that the actual or substantial damages do not occur until a later date. The act itself is regarded as the ground of the action, and is not legally severable from its consequences. * * *" 51 Am. Jur.2d, Limitation of Actions, § 135, p. 704.

The rule in Wyoming has been well settled by two cases, *Banner v. Town of Dayton*, Wyo., 474 P.2d 300 (1970) and *Town Council of Town of Hudson v. Ladd*, 37 Wyo. 419, 263 P. 703 (1928). In *Banner*, a municipal water line negligently designed and installed under the supervision of an engineer in 1956 began to spring leaks in 1964; this court held that the cause of action did not accrue until 1964 and the four-year statute started to run upon discovery of damage that year. In *Town of Hudson*, the town changed the course of a river in 1914. The damage to plaintiff caused thereby did not occur until flood waters in 1925 cut into a river bank causing his ditch to cave in. This court held that the cause of action accrued on the latter date and the applicable statute of limitations began to run at that time rather than when the town diverted the river.

Accordingly, in the present case since no damage was shown to have occurred at least until the water seepage reported by the Bensons in the summer of 1977, if that was a result of ground instability and not a defective sump pump, the cause of action did not accrue until then. Therefore, the statute of limitations could not, under any circumstances shown in this case, have started running until that summer.[12] The action was commenced September 19, 1979,

11. Section 1–3–105, W.S.1977:

"(a) Civil actions other than for the recovery of real property can only be brought within the following periods after the cause of action accrues:

"(i) Within ten (10) years, an action upon a specialty or any contract agreement or promise in writing;

"(ii) Within eight (8) years, an action:

"(A) Upon a contract not in writing, either express or implied; or

"(B) Upon a liability created by statute other than a forfeiture or penalty;

"(iii) Within five (5) years after the debtor establishes residence in Wyoming, an action on a foreign claim, judgment or contract, express or implied, contracted or incurred and accrued before the debtor became a resident of Wyoming;

"(iv) Within four (4) years, an action for:

"(A) Trespass upon real property;

"(B) The recovery of personal property or for taking, detaining or injuring personal property;

"(C) An injury to the rights of the plaintiff, not arising on contract and not herein enumerated; and

"(D) For relief on the ground of fraud;

"(v) Within one (1) year, an action for:

"(A) Libel or slander;

"(B) Assault or battery;

"(C) Malicious prosecution or false imprisonment; or

"(D) Upon a statute for a penalty or forfeiture, except that if a different limitation is prescribed in the statute by which the remedy is given the action shall be brought within the period prescribed by the statute."

12. We need not decide whether that particular water seepage was proximately caused by the same, if any, negligence in selecting a building site which resulted in the damages to the home while the Phillipses lived there since in any event the statute of limitations could not have run. In a case in which it matters, that would have to be resolved.

well within the statute. The district court was correct in refusing to dismiss the action under § 1–3–105, W.S.1977, supra.

## V

The City of Sheridan grounds its appeal on the issue as to whether there was any substantial evidence of negligence on its part which was a direct or proximate cause of the damage to the Phillipses' house. The appellees claim negligence of the City in maintenance of a drainage ditch which was located behind and above their property on the unopened proposed extension of Main Street. The position of appellees and ABC which originally joined the City is that through neglect the City permitted the ditch to become clogged with trees, growth and debris, causing the water to collect, soak into the ground behind the house and thus caused or contributed to the cause of the earth slide which collapsed its foundation. The City on the other hand takes the position that the ditch was blocked by the same subsidence of the hill behind it that caused the damage to the house.

The ditch in question was originally built in 1951; but sometime between 1968–1970, at the request of Mr. Johnston of ABC, some 200 feet of 24-inch metal corrugated pipe was installed in the ditch to keep it from pinching in. The opening of the pipe was directly behind the appellees' property.

Appellant City recognizes the well-known appellate rule which we have already stated that the supreme court must assume that evidence in favor of the successful party is true, leave out of consideration entirely evidence of the unsuccessful party in conflict therewith and give to the successful party every favorable inference which may be reasonably and fairly drawn from it. *Tavares v. Horstman,* supra. However, it is the City's further claim that once it first received notice of the blockage, it cleared out the debris and when it again clogged, it was because of earth slippage.

The evidence in the record which supports the position of appellees is that when appellees first noticed the blockage, it was about the same time as they noticed dis-placement of their foundation. Vincent Johnston of ABC was called by appellees and also noticed the blockage because of accumulated debris. However, the evidence of all the experts appears to be that water during the rains which occurred prior to that time had been standing in the ditch and because of lack of maintenance, was soaking into the ground, and contributed to the slippage which occurred behind appellees' home.

The drainage ditch was in the nature of a storm sewer designed by the City to capture and carry water runoff from the hill behind appellees' lot and other property below its location, over an easement acquired by the City which expressly states that it was "for the purpose of constructing a flood drainage ditch, and to thereafter maintain the same." The substance of the quoted matter appears at least three times in the grant of the easement.

The court instructed the jury as to the duty of the City as follows:

"JURY INSTRUCTION NO. 4

"In order for the Plaintiffs, William H, [sic] Phillips and Cynthia Phillips, to recover from the Defendant, the City of Sheridan, Wyoming, on their claim for negligence, you must find all of the following have been established:

"1. The Defendant was negligent in maintaining the drainage ditch constructed by it, in that it failed to exercise reasonable care to prevent the drainage ditch from creating an unreasonable risk of harm to the person or property of one who might reasonably be expected to be affected by the drainage ditch because of neglect and lack of maintenance.

"2. The Plaintiffs sustained losses which were caused by the Defendant's negligence."

"JURY INSTRUCTION NO. 5

"Negligence is the lack of ordinary care. It is the failure of a person to do something that an ordinary person would do, or the act of a person in doing something

that an ordinary person would not do, measured by all the circumstances then existing."

We cannot find that the City offered any instructions different from those given by the trial court nor were any objections made by the City to Instruction Nos. 4 and 5 as given. The court, at the close of the evidence, stated:

"Does everybody agree that there are three parties to whom negligence can be assigned?"

The court, after discussion and urging by ABC and City, ended up with negligence consideration for three parties and the non-party in the finding-of-percentages-of-negligence portion of the verdict: Plaintiffs (appellees), ABC, City and the Kasters.[13]

The City did object to Instruction No. 7 as initially presented to counsel at the instructions conference:

"MR. SCHWARTZ: City of Sheridan would like to object to Instruction Number 7 for the following reasons: 1st, that the court has already instructed the jury concerning negligence, and, that the Instruction No. 7 seems to define and make more stringent in the case of the City in relation to its drains; but primarily because of the last phrase there, having stated that we are liable for negligent acts and omissions in the performance of its duties, to exercise reasonable care in the maintainance [sic] and to keep them in reasonable repair and free of obstructions. It seems to me that places a strict liability in reference to, for example, free of obstruction.

"THE COURT: I will just strike the free from obstruction and put a period after repair.[14]

"Anything else, Mr. Schwartz?

"MR. SCHWARTZ: That's it, Your Honor."

The instruction, as changed, apparently then satisfied the City because no objection was made to the instruction with language deleted as noted by the trial judge. Instruction No. 7 does not modify or change Instruction Nos. 4 and 5 and at the most is surplusage. These instructions became the law of the case. *Cox v. Vernieuw*, supra; *In the Matter of Estate of Mora*, supra; *Gary v. Foster Lumber Co.*, supra; *DeWitty v. Decker*, supra.

■ We, therefore, determine the case as to the City on the basis of negligence as applied to private persons. No question of governmental immunity was raised in the trial court.[15] The City raises questions on appeal not raised in the trial court at the instructions conference or at the time the jury was instructed, namely that there is no liability for damages resulting from a dangerous condition which arises in connection with the operation of a storm sewer system

---

13. The court did not instruct the jury as to any particular duty of the appellees or Kasters as it did with ABC and the City other than through its general definition of negligence.

14. Instruction No. 7, then, as presented to the jury:

"Where a City constructs drains, it becomes its duty to see that they are maintained and kept in repair, and a City may be held liable for its negligent acts or omissions in the performance of its duty to exercise reasonable care in the maintenance of its drains and water courses, and to keep them in reasonable repair."

15. The court notes in passing *Oroz v. Board of County Commissioners of County of Carbon*, Wyo., 575 P.2d 1155 (1978), which abolished governmental immunity for governmental subdivisions "as to any and all claims arising on and after July 1, 1979" and held negligence was to be determined as in the case of private persons. Also, we do not find in the record at any point any reference to liability insurance. *Collins v. Memorial Hospital of Sheridan County*, Wyo., 521 P.2d 1339 (1974), declares acquisition of liability insurance to be a waiver of immunity. We note two cases which suggest that liability of a city for damage arising from sewer blockage and faulty maintenance may depend upon whether the operation and maintenance is governmental or proprietary: *Lore v. Town of Douglas*, Wyo., 355 P.2d 367 (1960) and *Savage v. Town of Lander*, 77 Wyo. 157, 309 P.2d 152 (1957).

A reviewing court cannot be expected to prosecute an independent inquiry for errors upon which an appellant may possibly rely and may invoke abandonment or waiver. *Scranton v. Whitlock*, Wyo., 389 P.2d 1015 (1964). We so view this matter, particularly since it is the announced policy of this court that municipalities have no immunity in tort actions.

until and unless it has actual or constructive notice of the defect or obstruction and an opportunity to correct it, citing *Elledge v. City of Des Moines*, 259 Iowa 284, 144 N.W.2d 283 (1966); *Freitag v. Montello*, 36 Wis.2d 409, 153 N.W.2d 505 (1967); *Bieber v. City of Newcastle*, U.S.D.C. Wyo., 242 F.Supp. 457 (1965) and 1A Antieau, Municipal Corporation Law, § 11.119. That may be the rule, but this court has not so held. We do not so decide because the jury was not called upon to consider the point by way of some appropriate instruction, given by the trial judge or demanded by the City. We will not consider on appeal questions not properly raised in the district court. *City of Rock Springs v. Police Protective Association*, Wyo., 610 P.2d 975 (1980). This is in effect raising an objection to instructions for the first time in this court, and we will not consider the same and will assume instructions as given were satisfactory at the time given. Rule 51, W.R.C.P. *Butcher v. McMichael*, Wyo., 370 P.2d 937 (1962). The spirit and purpose of this rule is to inform the trial judge of possible errors so he may have an opportunity to correct them. *Haley v. Dreesen*, Wyo., 532 P.2d 399 (1975).

 The law with respect to responsibility for a ditch seems to have been fixed in *Howell v. Big Horn Basin Colonization Co.*, 14 Wyo. 14, 36, 37, 81 P. 785, 790 (1905):

" * * * The construction of ditches is one of the customary and recognized methods of appropriating water, and conveying the same for use in irrigation and for other necessary purposes. It is the method more generally, and, indeed, almost universally, employed. While those engaged in such an undertaking, attended with possible risks to others, should be answerable for the conduct thereof with diligence proportioned to the apparent risk, there is no substantial reason, we think, for holding them accountable as insurers, nor for injuries not attributable to some fault or negligence on their part. * * * "

The court had occasion to review that rule in *Jacoby v. Town of City of Gillette*, 62 Wyo. 487, 174 P.2d 505 (1946), 169 A.L.R. 502, reh. denied 62 Wyo. 514, 177 P.2d 204 (1947), following a trial to the district court. The trial judge had ruled for the town on the facts where a drainage canal had overflowed doing damage to the lands of plaintiffs. This court concluded that unprecedented rains constituted an act of God. While it approved the rule of *Howell*, it decided there was no negligence on the part of the town. Since that time this court has, of course, handed down its decision which eliminated the act-of-God defense in negligence cases. *Cox v. Vernieuw*, supra.

This court has since been invited to adopt a rule of strict liability. However, it confirmed the rule that one who maintains a ditch for conveying water must answer for his negligent acts, but there is no substantial reason for holding him accountable as an insurer. *Douglas Reservoirs Water Users Assoc. v. Cross*, Wyo., 569 P.2d 1280 (1977); *Taylor Ditch Company, Inc. v. Carey*, Wyo., 520 P.2d 218 (1974); *Redland v. Tharp*, Wyo., 498 P.2d 1240 (1972); *South Cheyenne Water and Sewer District v. Stundon*, Wyo., 483 P.2d 240 (1971) (sewer case); *McCormick v. Town of Thermopolis*, Wyo., 478 P.2d 67 (1970) (rule acknowledged but there was a failure of proof by plaintiff to establish negligent maintenance).

The duty to maintain is a continuing one. *Taylor Ditch Company, Inc. v. Carey*, supra. The City was aware of the instability of the hillside upon which the ditch was located. Negligence involves, as we have also said with respect to ABC, a recognizable danger which is apparent or should be apparent to one in the position of actor. *Endresen v. Allen*, supra. This knowledge is exemplified by the testimony of an engineer on contract with the City in 1963. Mr. Johnston of ABC had been urging an extension of Main Street to get another access into Sheltered Acres. That study disclosed there were subsidence problems within the proposed Main Street extension upon which the ditch was located. There were water, seepage and drainage problems west and above the ditch. Another study in 1968 disclosed the same problem. The City de-

clined to construct the new street following those studies because of the risk of landslides. Again in 1977, before the fall of the appellees' home, a study was done by the Wyoming State Highway Department for the purpose of determining geological factors, which would affect an extension of Main Street as a construction belt in the same area. The reasonable inference was that it was done either at the instance and knowledge of the City or it should have been known. The study discloses that, "A drainage runs from the higher ground contributing to the groundwater problem to the extent of standing surface water in some places," and "There are active springs or evidence of springs within each slide area. These springs are thought to be the major source of water." Water was found by the study to be ponding in some areas.

Another engineer testified that, "If the ditch had been flowing freely the water might have got past the slide area faster and, thereby, not ponded the water directly into the slope behind the house. * * * the fact that the pond was there putting water into the slope certainly contributed to the collapse of the hill." "[T]he water in the ditch was charging this hill side * * *." The culvert was installed by the City because earth movement was pinching in the ditch.

From the evidence it was obvious that the ditch was built for flood drainage as stated in the grant of the easement. From studies made from 1963 through 1977, the character of the area above the ditch was such that accumulations of water from snow, rain and water spring runoff had to be carried away. These studies were made for and at the instance of the City. Therefore, there was foreseeable by the City a risk of harm if the water was not carried off. It is not uncommon for ditches to become clogged from natural growth and collected debris. Here was a known problem area of long standing with propensities to slide if overcharged with water. It could have been reasonably expected that failure to maintain the ditch would cause damage to those on the hill below the ditch. Failure to maintain is inaction. Negligence may be by inaction as stated by the trial court in its definition of negligence. This includes failure to do that which an ordinary person would do under the circumstances. There was an evidentiary basis for the jury's finding the City negligent and fixing its percentage at 15%.

Affirmed.

ROONEY, Justice, concurring, with whom ROSE, Chief Justice, joins.

I concur with the majority opinion, but must take some exception to footnote 7 thereof. I think it to be within the prerogative of the legislature to enact such measures as it sees fit, to refuse to enact such measures as it sees fit, and to "tinker" with any legislation as it sees fit—be it a uniform act or otherwise. A Wyoming legislator must have complete freedom to represent his constituency in the enactment of laws without deference to that which foreigners might think is a proper law for Wyoming—again be it a uniform act, a model act or otherwise. Our legislature has seen fit to amend and modify many uniform laws passed by it as such was dictated by Wyoming's special needs. The only concern of the courts with legislation should be that provided by the check and balance system under which our government was established.